## BALTIMORE *v.* BALTIMORE RAILROAD.

1. A railroad company wanting to borrow $4,500,000 to complete its unfinished railroad, a city, its chief stockholder, and interested in the completion, agreed to lend to it the sum.   The arrangement resolved on and carried out was this:

The city was to issue and sell, from time to time, as the railroad needed the money, its own bonds (having about 35 years to run), for $4,500,000, at a price, however, not *below* par; and was to issue to the commissioners of its sinking fund similar bonds for $500,000, which, with the constant accumulations of interest (to be invested in the purchase of the city debt), were to constitute a sinking fund for payment of the whole debt at maturity.   Any premiums which the city might get by the sale of

---

. the loan *above* par, and any excess which, at the maturity of the loan, it might be found that the city had made by its sinking fund operations, (above what would be necessary to pay the principal), were to enure to the benefit of the city treasury.

The railroad company, on its part, was to mortgage its road for $5,000,000; and to place in the city treasury, at a specified number of days before each instalment of interest fell due, the sum which the city had to pay on its $5,000,000 of bonds, and at a certain date before the maturity of the loan, the amount which should then be due by the city for the principal not yet bought in.   By the terms of its contract the railroad company was to pay "*all* and *any* expense *incidental* to the issue of any of the bonds."

All this took place in 1854.   In 1862, Congress passed an excise law, levying an income tax of 3 per cent. on all sums due for interest by railroad companies, which sum it required the companies to withhold from their creditors and pay to the government, making, by a subsequent act—one of June, 1864—such payment a discharge, in terms, from their creditors for the amount, "except where the companies might have contracted otherwise."   But no such tax was laid on the bonds of cities, nor did the act require *them* to withhold anything from their creditors.   The railroad company, to save itself from being distrained upon, and giving notice to the city of all that was done, paid the tax under such protest as by the acts of Congress would authorize a recovery of it by the city if it was illegally exacted:

*Held*, that the city did not, under the arrangement between it and the railroad company, stand in the position of a surety in such way as that the company was bound to prevent its being prejudiced by events not anticipated when the arrangement between the parties was entered into.

2. That the contract of the railroad company to pay "all and any expense incidental to the issue of any of the bonds," did not oblige it to pay this tax out of its own money, and so to pay the full interest to the city discharged of the tax.

3. That whether this was a tax laid on the securities of a municipality, and whether, if so, it was lawfully laid, was a question which the city was not in a condition to raise, as the tax having been paid under protest, and she having received notice of all that was done, could, under the statutes of the United States, have stepped in and tested the legality of the assessment and collection, by instituting proper proceedings to recover the money.

ERROR to the Circuit Court for the District of Maryland; the case being this:

In 1854, the Baltimore and Ohio Railroad Company being then unfinished, and needing money to complete its road, the city of Baltimore, which was a very large stockholder

in the road, and greatly interested to have it completed, agreed, in pursuance of an act of the legislature of Maryland, which gave it this power, to lend the company $4,500,000; and, in order to raise the money, to issue the bonds of the city for $5,000,000, payable in 1890, with interest payable quarterly, on the first days of certain months named. An ordinance was accordingly passed by the city authorizing the loan. It directed that the commissioners of finance of the city should issue certificates of city debt, or bonds, which they themselves were to sell, *not however below par;* and pay the proceeds of $4,500,000 to the register of the city. With the money thus put " from time to time " into his hands, the register was to pay the railroad company the amount that might be required by it. The remaining $500,000, and its quarterly interest, as accumulated, were to be reserved as a sinking fund to redeem the principal of the whole loan at maturity. The city at the time owed several other debts incurred in aid of internal improvement; and the ordinance proceeded:

" If, at the maturity of said bonds, the sinking fund shall have accumulated to an amount *exceeding* the principal sum of the loan authorized of $5,000,000, *the said excess shall be paid into the city treasury, for the use of the city,* and be applied to the extinguishing the internal improvement debt."

" The *premium,* if any, that may be received on account of the sale of the said certificates or bonds, shall be converted into a sinking fund and *invested in the public debt of the city of Baltimore,* and so from time to time, with the interest quarterly accruing, to be *applied to the payment of the original internal improvement debt of the city.*"

The railroad company in fulfilment of its part of the contract mortgaged its property to the city; the mortgage containing a proviso thus:

" *Provided,* That if the said railroad company do, and shall pay to the register of the said city, the principal sum of $5,000,000, less the amount of the sinking fund provided for therein, and its accumulations, *at least one month before the day on which the bonds,*

*directed by said ordinance to be issued, shall become redeemable,* and shall also pay to the said register interest at the rate of six-per cent. per annum on the whole amount of said certificates or bonds issued quarterly, and *in advance at least ten days previous to the first days of the several months mentioned in said ordinance,* which said payment shall commence to be made in advance of the first payments of interest which shall be required to be made by the city, on said certificates or bonds, and shall continue to be made as aforesaid until the repayment by the said company to the city, of the principal sums of money which shall or may be issued as aforesaid; and shall well and truly pay *all and any expense incidental to the issue of any of the bonds* as aforesaid, and shall pay the expense of recording this indenture of mortgage in the proper offices, then these presents shall be null and void; else to remain in full force and effect."

The railroad company having received the money from the city, paid the interest on its mortgage, as agreed on, and in full, until October, 1862.

On the 1st of July in that year,* Congress passed an excise law, levying an income tax of 3 per cent. on all sums of money due for interest by a *railroad* company on its bonds or other "evidences of indebtedness," and "authorized and *required*" such companies to deduct and *withhold* from all payments made to any party after the said 1st July, 1862, the said duty; thus, in effect, constituting the company the collector of the tax for the United States. A statute of June 30th, 1864,† enacted that payment over by the railroad companies should discharge them from that amount of interest, "except where said companies may have contracted otherwise."

Neither statute, however, taxed the bonds of municipal corporations. The Commissioner of Internal Revenue now made a demand on the railroad company, for 3 per cent. on its mortgage to the city, insisting that the mortgage was an "evidence of indebtedness" within the meaning of the act of 1862. The company gave notice to the city of this demand, and that if it was enforced by the government, the

---

* 12 Stat. at Large, 469.        † 13 Id. 284.

company would have to deduct.the 3 per cent. from the interest which it had hitherto paid the city. The city objected to this being done in any event, and the railroad company and city made a joint attempt to persuade the Commissioner of Internal Revenue that the case did not come within the act of .1862. The commissioner did not accept this view, and to prevent a distress upon it the company paid the tax, making a protest, however, setting forth fully and specifically the grounds of objection to the demand, " in view," as the protest declared, " of attempting to recover it under the provisions of the act of Congress in this connection;" provisions, which, when protest is properly made, authorized recovery from the government, if the tax have been illegally exacted. Having thus paid the tax the company deducted the amount of it from the payments. of interest to the city, and in October, 1864, the city brought this suit to recover the amount thus withheld. Judgment having been given in favor of the railroad company, the city brought the case here.

*Messrs. W. H. Norris and G. H. Chandler, for the city, plaintiff in error:*

1. The case shows that the position of the city in relation to the railroad was that of a surety. The transaction was in fact but a loan of credit for the benefit of the railroad. The bonds of the city were of a higher *market* value than bonds of the railroad, though of no higher real value; and so the city issues *its* bonds; the company stipulating that it will always pay to the register of the city, at least ten days before it becomes due, the interest on its mortgage (being the same sum exactly which the city has to pay on *its* bonds), so that without raising a cent by taxation the city might pay this large sum of interest; and the railroad agreeing also that when the principal is about to fall due it will put into the city treasury a month before it is actually due all principal not redeemed by the operations of the sinking fund. This is a pure loan of credit.

Independently, therefore, of the express stipulations, to

be referred to hereafter, the road company was bound by the nature of the transactions to indemnify the city, as if the form of principal and surety had been carried out. By that relation the situation of a surety can never be more onerous than that of the principal.

The possibility of taxation should have been foreseen by the principal, and it is a part of his obligation to indemnify the surety.\* If there is any hardship in the taxation, it is one which the borrower contracted to bear and is a part of the obligation of his contract.†

2. The contract expressly provided " that all and any expense incidental to the issue of any of the bonds" shall be chargeable to and paid by the railroad company.‡ Congress never intended to give the power to deduct the tax by the debtor when the debtor had contracted to pay all expenses incidental to the loan. It did not propose to alter contracts, but merely to use the debtor as an agency to collect the tax from the creditor whom it intended to tax, and it made that purpose very obvious by its act of June 30th, 1864. In this case the railroad company has " contracted otherwise."

3. The tax was not to be deducted in this case, because Congress did not intend double taxation of the same fund. It had no right to use *municipalities* as agencies for collection, they being political bodies not liable to their service. Accordingly no power was given to the municipality to deduct the tax from the holders of its bonds, for Congress has not attempted to employ *it* as a collecting agency. It paid full interest to its bondholders without abatement, and they are taxed on that income in their returns. Is not the fund double taxed?

4. The city, in the exercise of a function of government delegated by the State, had issued its bonds and borrowed money of the purchasers, which was brought into the mu-

---

\* Maltby *v.* Reading and Columbia Railroad Co., 52 Pennsylvania State, 148–9

† Dermott. *v.* Jones, 2 Wallace, 8; United States *v.* Keehler, 9 Wallace, 88.

‡ Catawissa Railroad Co. *v.* Titus, 49 Pennsylvania State, 277–281.

nicipal treasury.   Repayment was secured by the delegated power of taxation.   For the promotion of a public purpose, "a State object" constitutionally adequate to justify taxation, the money thus raised was lent, under a specific scheme for its reimbursement, to a private corporation as an agency to effect this public purpose.   The debt, by being thus due to the territorial political agency of the State, is due to the State, so as not to be taxable by the National government, and it is to be assumed was not intended to be taxed by the Internal Revenue Act.

*Mr. J. H. B. Latrobe, contra:*

The mortgage was given in 1854, at which time there was no income tax nor the expectation of one by any man. It comes to us as an incident of our civil war.   The "expense incidental to the issue of any of the bonds," was such expense and such alone, as related to the preparation of them, and such books and clerk hire as might be required in connection with them.

While the doctrine that a surety shall not be prejudiced by contingencies not anticipated at the time of creating the relation, is true as a general one, it is not true to the extent of vacating a contract such as exists here, where the parties declare what shall be their respective rights and liabilities.

But the doctrine has no application to this case.   The city was not a surety.   Had she guaranteed bonds issued by the railroad company, had she even placed her own bonds lent to the company, in the hands of the latter, there might be ground, perhaps, for saying that the city was a surety only.   But, when besides issuing her own bonds, she retained the possession of them, and sold them only when required to pay from time to time the moneys wanted by the company, the transaction is that of a principal borrowing money to lend it again; in this instance to aid in the promotion of an object in which such principal was deeply interested.

Or, had the ordinance provided that the mortgage should be released or become void so soon as the accumulations

of the sinking fund amounted to the entire debt of $5,000,-000, it might have been argued, that the city was a surety only, having no interest but to secure itself from loss. But the ordinance shows, that so far as the city is concerned, the transaction in one aspect is for her own benefit apart from the Baltimore and Ohio Railroad Company altogether. It directs all excess of the sinking fund, and all the premiums, if any, to go into the city treasury.

The transaction was intended as an operation by which the city, if the commissioners of finance performed their duty by making judicious investments, would be a gainer, and be furnished with the means of discharging a debt with which the Baltimore and Ohio Railroad Company was unconnected, the general internal improvement debt of the city.

By the ordinance the commissioners of finance were required to invest the interest and premium, if any, received by them, in the public debt of the city. Now, if the calculation which fixed the amount of the sinking fund and the length of the loan was based upon sales and purchases at par, the ability of the finance commissioners to invest at rates 8 and 10 per cent. below par (which it may be stated that as a matter of fact they have been able to do), would leave a large surplus in the hands of the city in 1890, to be applied to its general debt.

We agree that the tax is illegally laid, and we have paid it only to save a distress on us and under protest. If we recover it, we will pay it to the city, or the city using our protest can proceed, itself, to recover it.

Mr. Justice DAVIS delivered the opinion of the court.

It is contended, on the part of the city, that if the tax in question be a lawful exaction by the United States, the burden of it must be borne by the company, and that the obligation of the company to the city is not changed by reason of the imposition and collection of the tax. Whether this be so or not, depends on the nature of the contract between the parties, for the company was authorized to withhold the tax, unless it had contracted with the city to pay

it.* The position taken by the city is, that the company was bound to pay the full amount of the interest without deduction, because of the following words in the defeasance clause of the mortgage : "And shall pay all and any expense incidental to the issue of any of the bonds." It is, therefore, necessary to construe these words, and there is no difficulty about it, when we consider the subject-matter about which they were employed. The word expense may mean one thing in one case and quite a different thing in another. Its meaning in this case cannot be mistaken.

To carry out the arrangement between the parties required a considerable expenditure of money for printing, clerk hire, stationery, advertising, and similar matters. These expenses were incidental to the issue of the bonds, and it was right and proper that the railroad company—the party to be benefited by the transaction—should pay them. And it agreed to do so; but this agreement cannot be extended to cover the tax in question, for in no sense is it an expense incidental to the issue of the bonds. At the date of the mortgage (1854) there was no tax of the kind, nor any reasonable expectation of one. If there had been, it is easy to see that appropriate words applicable to the subject would have been used. But the words which were used did not relate to the subject of taxation at all, and it is very certain that the possibility of taxation was not in the contemplation of either of the parties to the mortgage.

It is unnecessary to discuss the general rules of law affecting the relations of principal and surety, and to show in what state of case a surety is required to save his principal from loss, because these rules are not applicable to this case. It is always competent for parties capable of entering into a business arrangement to fix the terms of it, and to declare what shall be their respective rights and liabilities under it. If the court can in any case see that this has been done, it is required to give effect to the contract which the parties chose to make for themselves, although, in the

---

* 13 Stat. at Large, 284.

absence of a special agreement on the subject, the rule to determine the rights of the parties might be different.

The parties to this suit have made a contract in relation to a matter of interest to both, and have settled what each shall do. To hold one of them responsible for contingencies not provided for, and not even anticipated when the contract was executed, would be to disregard instead of giving effect to the will of the parties.

It is contended, however, by the city, that the securities of a municipality like Baltimore are not taxable by the National government, and therefore the tax in question was an unlawful exaction. This presents an important question; but the city is not in a condition to raise it, and, under the circumstances, can have no cause of action against the company for paying the tax. It is difficult to see in what respect the company failed to discharge its duty in regard to this subject. It occupied the position of a stakeholder, owing the money either to the city or the United States, and wholly indifferent to which of the parties it should be paid. It notified the city that the United States were enforcing the collection of the tax, and did not pay it until it was obliged to do so to avoid the consequences provided for in the act in case of refusal, and not then, without a written protest stating distinctly all the grounds of objection claimed by the city to the assessment and collection of the tax. In this condition of things, if the city felt itself aggrieved by the action of the officers administering the internal revenue laws in a matter of interest to it and not the company, it should have stepped in, and taken upon itself the burden of testing the legality of the assessment and collection of this tax, by instituting proper proceedings to recover back the money. This it was authorized to do by these laws, which not only provide for the manner of collecting the revenue, but also furnish a mode of redress to the party who has suffered injury by their administration.*

---

* City of Philadelphia *v.* The Collector, 5 Wallace, 731; Nichols *v.* United States, 7 Id. 130–1; The Assessors *v.* Osborne, 9 Id. 571.

If there were injury at all, the city sustained it, and, as it did not avail itself of the privilege to sue, it cannot turn round and litigate the legality of the tax with the railroad company.   This tax was exacted under color of law, and the company, having notified the city of the demand of the United States and the proceedings taken to enforce it, and having protested against its collection, were justified in paying it.

And it cannot be required in this state of case, on its own behalf, to test the correctness of the ruling of the revenue officers.

JUDGMENT AFFIRMED.