Littleton, Judge,
delivered the opinion of the court:
The solution of the question involved in this case as to the right of plaintiff to be paid by the defendant the amount of $11,679.97 must be governed by the substance of the arrangements and transactions between plaintiff and the Government and the intentions of the plaintiff and the United States as evidenced by the Marketing Agreement of October 10, 1933, the Act of May 12,1933, and the facts and circumstances surrounding the sales of flour to the United States, packed and sealed, for shipment to and use in the Philippine Islands.
The pertinent facts concerning the agreements and transactions between plaintiff and the defendant which give rise to the claim presented in this suit are set forth in considerable detail in the findings. At the outset it should be stated that the Marketing Agreement of October 10, 1933, provided that the Secretary of Agriculture might, by written designation, appoint any officer or employee of the Department of Agriculture, or any person or persons, to act as his duly authorized representative in connection with any of the provisions contained in that agreement to be performed by the Secretary. All the transactions by plaintiff with the Government, in connection with which the claim here involved arose, were proposed and carried out by plaintiff and its members concerned with the knowledge and approval of the Secretary of Agriculture through his duly designated and authorized representative, or representatives.
*442 The plaintiff association was located at Portland, Oregon, and its territory covered the states of Washington, Oregon, and Northern Idaho; its business was that of dealing in and disposing of wheat and flour from the 1932 crop surplus estimated at about 25,000,000 bushels. The membership of plaintiff was limited to producers or an association of producers of wheat or flour in the territory mentioned and membership in the association was subject to approval of the Secretary of Agriculture. The operations and business transactions of plaintiff and its members were conducted by an executive committee of nine members and were subject to the written approval of the Secretary, one of the members of the committee being a duly designated and authorized representative of the Secretary of Agriculture. Subject to and with the approval of the Secretary, the executive committee was authorized to appoint a managing agent to act for the association subject to directions of the executive committee, and any and all actions taken by the managing agent, the executive committee, or by the association had to have the approval of the Secretary of Agriculture or his duly authorized representative. All such acts and transactions were so approved and the plaintiff and its members conformed to and strictly complied with these requirements of the Marketing Agreement.
Section 3 of the Marketing Agreement provided that the association should serve as a clearing house for arranging details of purchasing, shipping, handling, and selling wheat and/or flour purchased for export.
Section 4 of the Marketing Agreement provided for the giving by the Secretary from time to time of written instructions to the executive committee or its managing agent directing plaintiff to contract for the purchase of wheat produced in the Pacific Northwest area, above mentioned, for the purpose therein provided, which instructions included, among others, the price to be paid by plaintiff for the wheat and the terms of the purchase. It was further provided that plaintiff should not have at any one time outstanding net purchases in excess of 1,000,000 bushels of wheat against which excess there were no outstanding sales or contracts for sale, and plaintiff and its members agreed *443 to carry out and fulfill all instructions of the Secretary of Agriculture to tbe best of their ability.
Section 5 of the Marketing Agreement provided that with respect to the wheat so purchased under instructions from the Secretary, as provided in section 4, the plaintiff “shall receive written bids from its members, each day, for the purchase from the Association and the sale in the export trade of any part of such wheat in the form of wheat or flour. Such bids shall include the following: (a) The amount of wheat offered to be so purchased in the export trade as wheat or flour; (5) The Sales Prices at which such wheat and/or flour shall be sold in the export trade and the time of shipment. The sales of the wheat, if any, shall be made on the basis of No. 2 bulk, f. o. b. ship. The sales of the flour, if any, shall be on the F. A. S. basis for steamer loading at Portland and Astoria, Oregon, and Tacoma and Seattle, Washington; (e) The terms of such proposed sale and shipment including the C. I. F. bid and the specific deductions made in establishing the F. O. B. or F. A. S. price; and (d) The port or ports of destination of the wheat or flour to be thus sold.”
Section 5 of the Marketing Agreement further provided and required that copies of all such bids received by plaintiff association from any of its members must be submitted to the Secretary “who will then advise in writing the executive committee, or its duly appointed managing agent which bids to accept, if any.” Plaintiff agreed to accept only such bids as were approved by the Secretary and to notify those of its members whose bids had been thus accepted. Plaintiff further agreed, and was required after approval of the transaction by the Secretary, to transfer contracts for a sufficient amount of wheat purchased pursuant to section 4 of the agreement to permit the individual member or members whose bids had been approved and accepted to carry out and fulfill their bids. It was further expressly understood and agreed by plaintiff, its members and the Government that any wheat purchased by plaintiff pursuant to the written directions of the Secretary, as provided 'in section 4, “shall not be sold except as provided in section 5.”
Section 7 of the Marketing Agreement required plaintiff *444 to obtain from each of its members, who had made sales pursuant to section 5, verified statements with respect to such sales on forms furnished by the Secretary; that such statements should include the sales price for all the wheat and flour sold and the cost incurred with respect to the same in accordance with schedules B and C of the Marketing Agreement. The term “purchase price” was defined by the Marketing Agreement to be the price provided for in the wheat contracts purchased pursuant to section 4 and paid pursuant to the terms of such contracts, as provided in section 5, with adjustments as provided in schedule A. The term “net sales price” was defined by the agreement to be the sales price of wheat or flour less the costs incurred pursuant to schedules B or C in connection with any wheat sold as wheat or flour.
Section 8 provided that as to any part of the wheat purchased and sold either as wheat or flour, pursuant to section 5, the plaintiff should present to the Secretary a verified statement, on forms to be supplied by the Secretary, showing the purchase price of such wheat, the sales price, and the net sales price for such wheat or flour. The section further provided that “The Secretary agrees to pay to the Association within a reasonable time of the receipt of such statement and other documents which shall indicate to the satisfaction of the Secretary that such wheat and/or flour has been exported, or otherwise disposed of pursuant to Section 5. hereof an amount equal to the difference between the Purchase Price and the Net Sales Price.”
Section 9 of the Marketing Agreement provided that “out of the funds thus paid to plaintiff” by the United States through the Secretary of Agriculture, the plaintiff should reimburse itself for the cost which it incurred over and above the purchase price prior to the transfer of such wheat contracts to its members and pay to those members to whom the contracted wheat had been transferred by plaintiff, pursuant to section 5, an amount equal to the difference between the purchase price which such members had paid for the contracted wheat and the net sales price received in connection with the sale and delivery of such wheat or flour.
*445 Sections 10 (f) and 17 (a) of the Agricultural Adjustment Act of May 12, 1933, Tit. 7, U. S. Code, sections 610 (f) and 617 (a) define exportations of agricultural products to include exportations to the Philippine Islands, the Virgin Islands, American Samoa, the Canal Zone, and the Island of Guam. And section 17 (a) of the Agricultural Adjustment Act as amended (48 Stat. 670, 676, section 12) likewise includes the Philippine Islands in the term “exportation to any foreign country.”
While the Marketing Agreement containing thei provisions above discussed was in effect, and during the months of February, March, July, and August 1934, the supply officers of the TJ. S. Army and Navy at Cavite, Philippine Islands, in charge of the acquisition of supplies for use thereat, prepared and sent requisitions for certain quantities of flour to the appropriate supply officers of the Army and Navy in the western portion of the United States. For the purpose of this case we will discuss only the requisition of February 13, 1934, of the Naval Supply Officer at Cavite, P. I., for the purchase and shipment of 200,000 pounds of flour (see finding 4). This requisition was received by the Naval Supply Officer at Puget Sound Navy Yard, Bremerton, Washington, who thereafter, in the purchase and shipment of flour, acted for the United States as contracting officer and for the Naval Suply Officer at the Navy Yard at Cavite, Philippine Islands. In this transaction the United States acted through J. F. Hatch, captain, Supply Officer, U. S. N. Circular letters were sent by the Government through its supply officer to members of plaintiff association for bids for the quantity of flour desired to be packed and sealed in 50-pound tins to be delivered f. o. b. Wharf, Terminal #4, Portland, Oregon, and to be shipped under Government Bill-of-Lading to the Supply Officer, Navy Yard, Cavite, P. I. The Terminal Flour Mills Company at Portland, Oregon, a member of plaintiff association and a party to the Marketing Agreement of October 10, 1933, submitted to the Government an offer to furnish and deliver f. o. b. Portland the 200,000 pounds of flour from the 1932 wheat-crop surplus at a certain price per pound. The bid as prepared and submitted by The Ter *446 minal Flour Mills Company was regarded by plaintiff as a transaction under and in accordance with the Marketing Agreement with the United States, and the making of the bid, the resulting contract and the consummation of the transaction were ratified and approved by the Secretary of Agriculture. The unit pricei for the flour called for was 0.0319 a pound, or a total amount of $6,380. This was less than the current continental United States market price as fixed by the United States through the Secretary of Agriculture for wheat contracted for by plaintiff for purchase, and from whom The Terminal Flour Mills Company was required to acquire and did acquire wheat for thei production of flour to be sold and delivered at the price for which plaintiff had contracted for it. The difference in this instance between the purchase price of wheat and the net sales price of the flour produced therefrom, packed and delivered for shipment to the Philippine Islands as defined by sections 4, 5, and 7 of the Marketing Agreement, above described, was $1,384.12. Other like instances, three in number, produced excess net sales prices over purchase prices of wheat, which, when added to the excess of $1,384.12, just mentioned, totals $11,679.97 now sought to be recovered by plaintiff in the instant case.
The United States, acting through Captain Hatch, its supply officer at Bremerton, made an award to The Terminal Flour Mills Company, a member of plaintiff association, for the 200,000 pounds of flour for $6,380. This award was made February 21, 1934, and on or about the same date the standard form of Government contract for supplies was executed by the United States and The Terminal Flour Mills Company for the 200,000 pounds of flour under the terms and conditions above-mentioned. The flour was delivered to the defendant, packed and sealed, f. o. b. Portland, and was shipped March 8, 1934, on the S. S. California, of the States Steamship Line, consigned to the Supply Officer of the Navy Yard at Cavite, P. I. On the same date, plaintiff was paid by the defendant $6,380 specified in the supply contract with the Government represented by its supply officer at Bremerton, Washington, and, on March 23, 1934, *447 upon the necessary documents prepared and approved by the Secretary of Agriculture disclosing all the details of the transaction as called for and required under the Marketing Agreement of October 10, 1983, accompanied by a voucher for $1,384.12 approved by the Secretary of Agriculture and the Comptroller of the Department of Agriculture, plaintiff was paid the amount of $1,384.12 by A. O. Walsh, Major, F. D., Vancouver Barracks, Washington, by check #101790 dated March 23, 1934 on the Treasury of the United States. The certificate of the Secretary of Agriculture by the Comptroller of the Department of Agriculture was as follows:
I certify that I have verified the transactions within enumerated and as set forth in detail on forms attached; that said transactions were in accordance with terms of the contracts approved by the Secretary of Agriculture; that the transactions listed are in accordance with the agreement noted herein (Marketing Agreement Series, Agreement 14) and that verification.thereof has been made by check against the books and records maintained by the Association pursuant to section 3 of said agreement, and this voucher is hereby approved for payment in the amount of $1,384.12.
Thus the matter stood for a little more than three years when, on May 20, 1937, G. F. Allen, chief disbursing officer of the Agricultural Adjustment Administration, Department of Agriculture, at San Francisco, California, prepared a schedule of disbursements on which was shown an amount of $19,477.76 admittedly due plaintiff under the Marketing Agreement in connection with transactions, about which there was no dispute, and a deduction therefrom in the amount of $11,679.97 theretofore in 1934, approved by the Secretary of Agriculture and paid to plaintiff on account of the transactions hereinbefore described, earned out and concluded under the terms of the Marketing Agreement. Other counter-adjustments, about which there were no disputes, were also made on this schedule, all of which totalled $18,595.04, leaving a balance of $882.72, which was paid. This schedule of disbursement was transmitted before payment to the General Accounting Office for preaudit and was approved. This was done without the knowledge of *448 the plaintiff. The disbursing officer, when making payment of the amount of $882.72, attached to the disbursement schedule sent to plaintiff a statement that “This office has been advised that such sales [in connection with which the $11,679.97 had been paid] lack the essential characteristics of a ‘sale in the export trade’ and that no indemnities could properly be paid under the agreement with respect to such sales.”
The United States, acting through the Secretary of Agriculture, has not at any time decided that the transactions and sales hereinbefore described and referred to in the schedule of the disbursing officer above-mentioned did not come within and were not covered by the Marketing Agreement of October 10, 1933, or that the amount of $11,679.97 paid thereunder to plaintiff by his direction could not properly be paid under the Marketing Agreement with respect to such sales. On June 29, 1934, the office of general counsel of the Agricultural Adjustment Administration, Department of Agriculture, considered an inquiry from the Grain Section with reference to transactions of the character here-inbefore described and, on that date, in an opinion by the assistant general counsel written to the Grain Section of the Agricultural Adjustment Administration, it was stated: “To give answer to your inquiry of June 26, the undersigned is of the opinion that (a) The North Pacific Emergency Export Association has the power to approve the sale of flour to the U. S. Army against proof that such flour is for foreign destination. Such a sale is one which may fairly be said to look to ‘the removal of * * * surplus of wheat from the depressed domestic market * * *’ as per the terms and conditions of the Marketing Agreement. It would appear that a foreign market is any market other than the domestic market; (5) the sale of wheat or flour for consumption in the Philippine Islands is correctly classified as a sale looking to a ‘foreign’ market.”
On September 16, 1938, and again on June 16, 1939, the General Accounting Office, in opinions sent to plaintiff, held that the “unambiguous and unequivocal limitations of the Marketing Agreement” of October 10,1933, showed that the *449 sales and the transactions in connection with which the United States, by direction of the Secretary of Agriculture, had paid plaintiff $11,679.97 were not covered and did not come within the terms of the Marketing Agreement, and that there was no legal basis for payment of the amount. The theory upon which the General Accounting Office based this conclusion, as the opinions show, was a technical interpretation of the terms “domestic transactions,” “export trade,” “trade or trader”; upon that interpretation it was held in substance that the Marketing Agreement did not apply and could not be held to apply to transactions of the character involved with the United States; that any purchase by the United States was entirely a domestic transaction and could not be regarded as looking to a “foreign” market; that the United States was not engaged in trade or as a trader and that no purchase by it, even though for shipment and use at a point defined by the statute, which was a part of the Marketing Agreement, and under which the agreement was made, could be regarded as a sale in the “export trade.”
We are of opinion from all the facts and circumstances disclosed by the record, the relationship of the parties, the character of the transactions and the intention of the parties, as clearly evidenced by the practical construction which they placed upon the agreement between them, that the contemporaneous interpretation and view taken by the Secretary of Agriculture and the view of the Assistant General Counsel of the Agricultural Adjustment Administration were correct and that the conclusion of the General Accounting Office was erroneous. The practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed by the courts to be of great, if not controlling, influence. Baltimore v. Baltimore and Ohio Railroad Co., 10 Wall. 543; Brooklyn Insurance Co. of New York v. Dutcher, 95 U. S. 269; Old Colony Trust Co. v. City of Omaha, 230 U. S. 100. The meaning of the contracting parties is the contract. Whitney v. Wyman, 101 U. S. 392. The intent of the parties prevails whenever it can be as *450 certained. George v. Tate, 102 U. S. 564. There cannot be any doubt in this case as to what the parties meant and what they intended; that is conclusively proved by their acts and conduct with full knowledge of the facts.
The technical meaning of the terms above referred to and discussed in the opinion of the General Accounting Office, and here relied upon by counsel for the defendant, does not in the circumstances disclosed help the defendant’s case or hinder, the plaintiff’s claim. Actually and as a practical matter the transactions constituted exportations of flour, as exportations were defined in the statute and intended under the Marketing Agreement as it was contemporaneously interpreted and applied by the plaintiff and the United States. The United States got the flour which was purchased for shipment to the Philippine Islands for an amount, including the amount here involved, which did not exceed but only equaled the current market price. This price the United States would have had to pay, and perhaps more, as profit, had the flour been obtained independently of the Marketing Agreement. A designated representative of the Secretary of Agriculture was an active member of the controlling executive committee of the plaintiff association; its managing officer was appointed with the approval of the Secretary and was subject to the direction of the Secretary; and all the acts and transactions of plaintiff association and its members under the Marketing Agreement were subject to the direction and control of the United States through the Secretary of Agriculture. Nothing that was done was illegal in the sense that it was prohibited or that the Secretary of Agriculture, acting for and on behalf of the United States, exceeded the scope of his authority.
Judgment will be entered in favor of plaintiff for $11,-679.97. It is so ordered.
Madden, Judge; Jones, Judge; Whitaker, Judge; and Whalet, Chief Justice, concur.