## CENTRAL ENGINEERING & CONSTRUCTION CO. v. UNITED STATES.

### No. 44604.

Court of Claims.
April 2, 1945.

Theodore B. Benson, of Washington, D. C., for plaintiff.

E. E. Ellison, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen. (Brice Toole and Milton Kramer, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff and defendant, represented by its contracting officer, Oliver G. Taylor, Chief of the Eastern Engineering Division, National Parks, Buildings, and Reservations, Department of Interior, entered into a contract dated July 19, 1933, under which plaintiff agreed to construct "(a) Five Naval Radio Station Buildings, having plumbing, heating, and electrical systems; all complete and ready for use, (b) A complete water supply system, including pump, motor and pipe lines from Government well to

Apartment Building and Intercept Building, (c) Electric service lines to the five Naval Radio Station Buildings and the two Radio Towers from the Main Panel board in the Power House." The contract was signed by plaintiff shortly before August 1, 1933; it was signed by defendant by the contracting officer and approved by the head of the department August 1, 1933. The executed contract was delivered to plaintiff August 4, 1933, and notice to proceed with the work was thereafter given.

The buildings, systems, and installations referred to, including the excavations and other work in connection therewith, to be done by plaintiff and by defendant were described and explained in those provisions of the specifications referred to in the findings herein. The site of the structures was on Big Moose Island at the southern end of Schoodic Peninsula, on the coast of Maine, and their locations were from 750 to 1400 feet northwest from the coastline at the mouth of Arey Cove. The terrain had an upward slope from the coastline, and the area where the buildings were to be constructed was covered with a very thick growth of spruce woods. Outcroppings of ledge rock are common on Big Moose Island, and fragments of ledge rock were at places exposed on the surface of the ground at or near the site of the Apartment Building, which was the largest structure called for by the contract.

Plaintiff sues to recover $3,555.30 allowed by the contracting officer and the head of the department as an extra under the contract for 507.9 cubic yards of rock excavated by plaintiff at a unit price of $7.00 per cubic yard; and the question presented is whether, under the terms and conditions of the contract, specifications, and drawings, as written and as intended by the parties, this allowance or any part of it was authorized and proper.

After approval by the head of the department on March 19, 1934, of Extra Work Order No. 2, quoted in finding 23, the Government through the contracting officer paid plaintiff by monthly payment vouchers approved under art. 16(a) of the contract for all the rock excavated within the dimensions and lines shown on the drawings at the contract unit price of $7.00 per cubic yard. The total amount so excavated was 507.9 cubic yards, and the total of the amounts so paid was $3,555.30. On November 2, 1934, after the contract work had been completed and accepted on September 22, plaintiff and the contracting officer prepared and signed a final voucher for payment of $12,829.82 representing the retained percentage on previous monthly payments under art. 16(b).

This final payment voucher, which also disclosed all payments which had been made under change orders and extra work orders, was sent to the General Accounting Office for preaudit before payment of the amount of retained percentage. The Comptroller General disallowed, as being unauthorized, the entire amount of $3,555.30 and deducted it from the $12,829.82 shown on the vouchers. The Comptroller General wrote three opinions, the first set forth in finding 27. He held that Extra Work Order No. 2 was unauthorized and without consideration "in view of the plain and unambiguous requirements of the specifications." He lightly passed over par. 11 of the specifications, saying, in effect, that the absence of any indication on the drawings as to conditions of the rock rendered par. 11 of no consequence. He relied upon the preceding paragraph, numbered 10, and concluded since that provision, as well as others, mentioned rock and stated that the contractor should remove all rock to the depths shown, and that since such depths were shown on the drawings, such rock excavation as might become necessary was required to be included in the lump-sum bids and lump-sum contract price for all work complete, and that if plaintiff did not include the cost of the rock excavation in its lump-sum bids it had simply submitted bids that were too low and the Government could not be held responsible therefor. Counsel for defendant seek to sustain the Comptroller General's decision.

The formal printed contract signed by the parties, which made the specifications and drawings a part of it, was the Standard Government Form of Construction Contract. The defendant's specifications and drawings were prepared especially for this construction project and in view of the language and the many provisions of the specifications concerning excavation, including rock, to the depths shown for the basements and foundations of the buildings and facilities, and the fact that none of the drawings relating to excavations contained any note, tracing, or indication as to "rock conditions," the intention of the parties to the contract concerning the matter of payment for rock excavation becomes important, i. e., whether they intended by the pro-

visions of the contract documents that such payment was required to be included in the lump-sum bids for each building and in the total lump-sum contract price, or whether such rock excavation as might be found to be necessary in order to conform to the excavation lines and dimensions shown on the drawings should be paid for as an extra at the unit price of $7.00 per cubic yard bid and included in the contract in connection with excavation of rock. The specifications are clear that the contractor would be required to perform the specified excavation work, whether it consisted of earth or rock, and it is also clear from the language of the specifications that they anticipated or contemplated that some rock excavation would probably be necessary. This, however, does not, as the Comptroller General thought, answer the question presented. The specifications and drawings were not clear as to the matter of whether the lump-sum bids required for each of the five buildings and each of the two systems should be based upon and include the amounts to be paid for excavation of all material, whether earth or rock, to the depths shown; or whether the lump-sum bids might or should be based on excavation of earth, leaving the matter of payment for such rock excavation as might be found necessary to adjustment on the basis of the unit price called for and submitted with the lump-sum bids.

After examining the site and considering the specifications and the drawings, plaintiff interpreted them as last above mentioned and computed his seven lump-sum bids, totaling $123,760, on the basis of earth excavation only to the depths shown according to the lines and dimensions entered on the excavation drawings, the total amount included for such excavation being $1,500; and under the unit-price provisions of the specifications and bid form, plaintiff submitted, among others, a unit-price bid of $7.00 per cubic yard for excavation of rock. We think this interpretation of the contract documents was a reasonable one.

The specification provisions most directly pertinent to the matter of excavation and as to how the bids might be computed and made are paragraphs numbered 9 to 13, inclusive; 16 and 17 relating to the Apartment Building; and 41 of the General Conditions. These paragraphs are as follows:

"Excavation

"9. Remove all vegetable matter (top soil) from the area occupied by the building and stack at the site where directed.

"10. Remove all rock to depths as shown, in all cases at least 6 inches below the existing grade of ledge rock, to provide level, clean beds to support the foundations, and 5 inches below finished floors of the Basement.

"11. In case the actual conditions of rock differ from those shown on the drawings, an adjustment in the contract price will be made, based on a unit price basis to be submitted with the estimate.

"12. This Contractor shall excavate to the dimensions and depths indicated or necessary for all foundation walls, interior bearing walls, pier footings and trenches for interior piping as shown on the Plumbing Drawings.

"13. Excavate for the footing drains shown along the North East side."

"Superfluous Earth

"16. This Contractor shall spread or dump all superfluous excavated material around the immediate vicinity of the building at a distance not greater that 80 feet as directed.

"Topsoil

"17. Material from the excavation suitable for topsoil shall be deposited in piles separate from the other excavated material. Piles of topsoil shall be located so that the material can be readily used for finished surface grading and shall be protected and maintained until the completion of the General Contract."

"Unit Prices

"41. (a) The Contractor shall submit with his bid the following unit prices for use upon any or all work.

"a. Excavation (earth) in bulk per cu. yd.

"b. Excavation of rock and boulders over ½ cu. yd. per cu. yd.

"c. Concrete in piers and walls, per cu. yd.

"d. Reinforcement rods per pound.

"e. Concrete wall forms per sq. ft.

"f. Concrete pier forms per sq. ft.

"(b) Such prices will be used as a basis for correlation with articles 3 and 4 of the Standard Government Form of Contract."

The drawings applicable to excavations for the different structures and installations showed the dimensions and depths of excavations, which, so far as required of plaintiff, were from six inches to 5½ feet for building, and from 4 to 6 feet for sewer trench adjacent to Apartment Building, but none of the drawings showed or indicated "conditions of rock" by a note, tracing, or statement. The specifications were apparently written before the defendant had examined the site and dug the test pits. Par. 11 rather clearly indicates that its intention was that the drawing would indicate the rock conditions to the extent that the contractor should include same in his lump-sum bids called for in the Bid Form, and that rock conditions not so indicated which might be encountered would be paid for as an extra at the contract unit price called for in the bid. (See art. 1 of the contract, finding 2.)

A reading of paragraphs 10 and 11 together, as they must be read because both were dealing with rock conditions, and a consideration of the excavation drawings in the light of the natural meaning of the language of those paragraphs reasonably supports plaintiff's interpretation that the absence of any indication on the drawings as to rock conditions meant that if rock should be encountered and had to be excavated, such "actual conditions of rock" would "differ from those shown on the drawings," and would call for "an adjustment in the contract price * * *, based on the unit price basis to be submitted with the estimate."

The contracting officer and the head of the department agreed with plaintiff's interpretation of the intent and meaning of the specifications and drawings, and any ambiguity which might otherwise appear on the face of the documents is therefore now of no moment. The interpretation of a contract by the parties to it before it becomes the subject of controversy is deemed by the courts to be of great, if not controlling, weight. City of Baltimore v. Baltimore & Ohio Railroad Co., 10 Wall. 543, 19 L.Ed. 1043; Brooklyn Life Insurance Co. of New York v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Old Colony Trust Company v. City of Omaha, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410. " * * * the meaning of the contracting parties is the agreement." Whitney v. Wyman, 101 U.S. 392, 396, 25 L.Ed. 1050. "The intent of the parties is the contract, and whenever that is ascertained, however inartificially expressed, it is the duty of courts to give it effect." George v. Tate, 102 U.S. 564, 570, 26 L.Ed. 232; North Pacific Emergency Export Association v. United States, 95 Ct.Cl. 430, 448, 449.

Aside from the interpretation of the contract as evidenced by the issuance of Extra Work Order No. 2, there is other direct evidence which shows such intent. When plaintiff encountered rock and found that a considerable amount would have to be removed in excavating to the dimensions and depths shown on the drawings, it made claim for payment therefor as an "extra," and the acting contracting officer promptly replied and, after quoting the substance of par. 10 of the specifications, stated that "The limit of excavation as shown on the elevations of the buildings, therefore, indicates, in line with this article [para.] 10, the rock conditions, referred to in art. [para.] 11, that were expected to be encountered." Further in this letter he stated that "When the plans [drawings] were drawn the depths of foundations were determined by the elevation of rock as shown by a series of test pits. These pits were afterwards left uncovered with rock exposed to serve as a guide to bidders in calculating the amount of rock that would be necessary." This letter indicates why the Government did not insert on the drawings any note or tracing of "conditions of rock" as contemplated by par. 11, and that this omission was because the depths of foundations were determined by the test pits. Plaintiff's president was uncertain in his testimony how deep these test pits were; he stated that they were from about two to three feet deep, but the above letter indicates that some of them were probably five feet deep. The maximum depth of excavations required of plaintiff was six feet, and for the most part the depths were from one and one-half to five and one-half feet.

In addition to the foregoing, the evidence shows that it is one of the recognized customs in the construction industry to base specifications and bids with reference to excavation on earth excavation, which is easy of calculation, leaving the matter of payment for such excavation of rock as may be necessary to adjustment on the basis of separate unit prices, or by some other method. It is obvious that the contracting officer considered this custom and the reasonableness of plaintiff's interpretation of the specifications and drawings in

reaching his decision to issue Change Order No. 2. The Government frequently adopts that practice. Schmoll et al. v. United States, 93 Ct.Cl. 572, 575; Union Engineering Co., Ltd., v. United States, 97 Ct.Cl. 424, 429, 430; John M. Whelan & Sons, Inc., v. United States, 98 Ct.Cl. 601, 617; Rego Building Corp. v. United States, 99 Ct.Cl. 445, 452, 459.

The evidence further shows that when submitting the Extra Work Order No. 2 to the head of the department for approval, the statement was made that the order for payment as an extra "involves the excavation of rock in foundation which was not anticipated and not indicated on the drawings" and that the extra work order "is made solely in the interest of the Government."

In view of the specific provisions of the specifications and the interpretation of the parties, the Standard "Examination of the site" provision, contained in par. 16 of the General Conditions of the Specifications, is not controlling here.

The allowance of payment for the 507.9 cubic yards of rock excavated as an extra does not result in a double payment to plaintiff for "excavation" since plaintiff based its bid on earth and gravel excavation. However, in view of the evidence, plaintiff is not entitled to recover the full amount of $3,555.30 claimed and computed at $7.00 per cubic yard since this rock excavation displaced an equal amount of earth excavation which plaintiff did include in its lump-sum bids and which it would have been required thereunder to excavate if rock had not been encountered within the dimensions and lines shown on the drawings. The deduction from the total of $3,555.30 of $304.75, representing 507.9 cubic yards of displaced earth at the unit price of sixty cents per cubic yard, gives plaintiff under the contract a net of $7.00 per cubic yard for rock, or $3,250.55 in addition to the lump-sum contract price. Rego Building Corporation v. United States, supra.

Judgment will be entered in favor of plaintiff for $3,250.55. It is so ordered.

MADDEN and WHITAKER, Judges, concur.

WHALEY, Chief Justice (dissenting).
I cannot agree with the majority opinion.

We are dealing with a lump-sum contract. The three cases cited in the majority opinion as upholding the custom of the Government in dealing with contracts of this nature are not apposite because the contracts in those cases were not lump-sum contracts. They specifically provided for payment of rock excavation as an extra, not to be included in the amount bid. The contract under consideration provided for payment for "extra rock excavation" which plainly showed that some rock excavation was included in the amount in the contract. Double payment for the same work was not intended and, in my judgment, cannot be allowed. To permit recovery is allowance of double payment.

In July 1933 plaintiff entered into a contract with the Department of the Interior, National Park Service, to construct an apartment building, a powerhouse, pump house, interceptor building, and a radio compass station complete with plumbing, heating and electrical systems, a complete water supply system and certain electric service lines, for a lump sum of $123,760.00.

These buildings were to comprise a Naval Radio Station on Big Moose Island at the southern tip of Schoodic Peninsula, on the coast of Maine. The coastline of this island consisted mostly of rock formation. Outcroppings of ledge rock are common to Big Moose Island and fragments of ledge rock were exposed on the surface of the ground at and near the radio station site.

The contract required that plaintiff visit the site and make its own examination before bidding. The site was visited by the plaintiff and it found shallow pits, which defendant had dug, appearing to be test holes but plaintiff did not find any ledge rock disclosed therein. The drawings did not indicate whether or not there was ledge rock. The specifications clearly and distinctly notified plaintiff that there was certain information given on the drawings, specifications, and accompanying plans, which had been obtained by the Government and which was believed to be reasonably correct but that the Government did not warrant its completeness or accuracy and the prospective bidders were warned to make their own examinations.

This was a lump-sum contract containing under article 41 of the specifications, a provision requiring plaintiff to submit specific prices which it would charge for the removal of extra earth excavation and rock excavation.

Paragraph (b) of Article 41 of the specifications above provided:

"Such prices will be used as a basis for correlation with articles 3 and 4 of the Standard Government Form of Contract."

Article 3 provides for an equitable adjustment where changes are made and for the contract to be modified accordingly.

Article 4 provides for "changed conditions."

The specifications for the excavation for the apartment building provided:

"9. Remove all vegetable matter (topsoil) from the area occupied by the building and stack at the site where directed.

"10. *Remove all rock to depths as shown,* in all cases at least 6 inches below the existing grade of ledge rock, to provide level, clean beds to support the foundations, and 5 inches below finished floors of the Basement.

"11. In case the actual conditions of rock differ from those shown on the drawings, an adjustment in the contract price will be made, based on a unit price basis to be submitted with the estimate." [Italics mine.]

The specifications with respect to the powerhouse, pump house, and interceptor building provided for excavation "to the required depths, as shown on drawings," and for the radio compass station, "remove the topsoil and excavate the rock to dimensions and depth as shown."

The difference between these two expressions is simply that with respect to the powerhouse, pump house, and interceptor building the depths shown are those on the drawings; with respect to the apartment house and the radio station, the words "on the drawings" are lacking.

The only place that the depths could be shown would be on the drawings and the drawings provided that the excavations to be made by the plaintiff under its lump-sum contract were from 6 inches to 5½ feet below the natural surface of the ground for the buildings and from 3 feet to 14 feet for certain sewer trenches.

There was no test pit data nor was there on the drawings any reflection of the subsurface conditions or the material which existed below the ground.

During the course of the work in August 1933, plaintiff encountered ledge rock in excavating the foundations of the various buildings and requested of the contracting officer in writing extra pay for this work. In September the contracting officer advised the plaintiff that the specifications required him to "remove all rock to depths as shown" and "in all cases at least six inches below the existing grade of the ledge rock." Plaintiff was advised that, if the excavations had to be made to a greater depth than shown on the drawings, an adjustment would be made according to the provisions of Article 11 of the specifications.

Practically all of the total quantity of rock herein involved was removed prior to February 3, 1934, and in March 1934 an extra work order was issued by the defendant allowing payment for extra work in accordance with Articles 27 and 29 of the specifications at the unit rate of $7.00 per cubic yard, an estimated total of approximately $3,570.00. This extra work order was approved by the Assistant Secretary of the Interior. Defendant's survey of the rock excavation on November 27, 1934, showed a total of 507.9 cubic yards.

Plaintiff was paid the sum of $3,555.30 by the disbursing officer and, when the contract was completed and the final settlement applied for to the General Accounting Office, the Comptroller General deducted the amount which had been paid under the Extra Work Order on the ground that the plaintiff had a lump-sum contract and no work had been done which was not included in the amount of plaintiff's bid; and that the Extra Work Order was for the identical work which was required by plaintiff's contract.

There is nothing to show in the agreed facts that the plaintiff excavated below depths shown on the drawings.

The dispute in this case is not on any question of fact but on the validity and effect of the so-called "Extra Work Order" issued by the contracting officer. Defendant claims that it is invalid. This is the sole issue.

The only difference between the specifications and the Extra Work Order is that the specifications provide "remove all rock to depths as shown" and the Extra Work Order provides "remove all rock to depths as shown on drawings."

The only place that the depths are shown is on the drawings and when plaintiff made its bid it had the drawings and knew, or should have known, that the drawings required that excavation should be at least

six inches to 5½ feet below the natural surface of the ground for the buildings and from 3 feet to 14 feet for certain sewer trenches. The adding of the words in the Extra Work Order "on the drawings" did not clarify or make more plain the specifications which provided that the excavations should be made "as shown."

Any contractor of experience or engineer of even limited experience would have naturally gone to the drawings to ascertain the depths to which the excavations would have to be made.

Therefore, there was no difference between the Extra Work Order and the contract specifications as to the work involved. The work described was identical.

Article 11 of the Specifications, quoted in Finding No. 7, providing that in case the actual conditions of rock were different from those shown on the drawings the contract would be adjusted, is not important because the drawings did not show the rock conditions. The Government made no representations as to subsurface conditions. It specifically required that the plaintiff should make its own examination and notified it that the data which the Government possessed was not, and should not be taken as, a warranty of the subsurface conditions. There was no agreement as to whether they would encounter earth or rock except in the specifications, where under Article 10 there is mention of "existing grade of ledge rock," and the existing grade was to be ascertained by the plaintiff in his own examination of the site.

In my opinion, insofar as Extra Work Order No. 2 is concerned, it attempts to increase the contract price, and is plainly without consideration, for it was a duplication of the work which the plaintiff was required to do under the contract and included in the lump-sum bid. To allow payment on this Extra Work Order would constitute double payment for the same work performed by the contractor.

Whether or not it was a mistake to issue this Extra Work Order, it could not create a liability. In the case of Bausch & Lomb Optical Co. v. United States, 78 Ct.Cl. 584, 607, the court said:

"In these circumstances the contract of March 8, 1919, was one the contracting officer, Major Hawkins, had no authority to make and the United States was not bound by it. William Tod Wilcox v. United States, 56 Ct.Cl. 224. If the plaintiff's claim against the War Department for one-fourth part of the cost of the extra guards was based on a contract, express or implied, the contract of March 8, 1919, added nothing to plaintiff's legal rights. If the claim was not based on such a contract it was invalid and unenforcible against the United States and could not be vitalized into a legal claim by a subsequent contract. Agents and officers of the Government have no authority to give away the money or property of the United States, either directly or under the guise of a contract that obligates the Government to pay a claim not otherwise enforcible against it."

In my judgment the petition should be dismissed.

JONES, Judge, took no part in the decision of this case.