Littleton, Judge,
delivered the opinion of the court:
The plaintiff sues to recover money to which it asserts it was entitled under a contract with the United States. Defendant, under its interpretation of the contract, denies that plaintiff is entitled to the payment claimed.
The contract under which this claim arises was made on November 18, 1947, between plaintiff and the Army Corps of Engineers. It required plaintiff to construct an earth embankment and spillway of Cherry Creek Dam and Reservoir near Denver, Colorado. Work was commenced in the spring of 1948 and was completed in January of 1950. One part of the work required by the contract was the placing, on the upstream face of the dam, of a thick blanket of sand and gravel covered by a still thicker layer of heavy rock riprap to prevent the water of the reservoir from eroding the earthen dam.
Sections 4-08 and 4-05 of the contract specifications contained the following pertinent provisions:
4 — 03. placing riprap. The placing of riprap on the upstream face of the dam includes the placing of the riprap and the sand and gravel blanket. * * * The sand and gravel blanket and the riprap may be dumped and spread by mechanical equipment and arranged by hand, if necessary, to form a compact layer conforming to the lines and grades indicated on the drawings. Placement shall be kept within the following tolerances:
Sand and gravel blanket, two inches + or —
Riprap, sis inches + only
# * # * *
4-05. measurement. Material used in all work covered by this section will be measured in its final position. The volume will be computed by multiplying the surface area by the actual average depth of each layer within the neat lines as indicated on the drawings. No allowance will be made for misplaced materials.
The contract plans included a cross section drawing with lines showing the sand and gravel blanket to be 9 inches thick, *878 and the layer of rock riprap to be 18 inches thick. Applying the language of section 4-08 of the specifications relating to tolerances to the thicknesses shown on the drawings, the contractor could have complied with the contract by making the sand and gravel blanket any thickness from 7 to 11 inches, i.. e., 9 inches with a tolerance of 2 inches plus or minus, and by making the layer of rock riprap any thickness from 18 to 24 inches, i. e., 18 inches with a tolerance of 6 inches plus only.
As the work was actually done, the sand and gravel blanket was laid with a uniform thickness of approximately 9 inches, and we have no question about that part of the work. The layer of riprap, as placed, was on the average considerably more than 18 inches thick. The plaintiff contends that the riprap was, on the average, more than 22 inches thick.
Under the provisions of the contract, payment for furnishing and placing the riprap was to be on a unit price basis of $5.50 per cubic yard. The contract stated only an estimated number of yards of riprap. The dispute involved in this suit is whether the contract gave plaintiff the right to be paid for the number of cubic yards of riprap actually placed or only for the number of yards that would have been placed if the layer of riprap had been held to a uniform thickness of 18 inches. The additional riprap actually placed and for which plaintiff claims it is entitled under the contract to be paid, is alleged by plaintiff to be 40,796 cubic yards.
The contract documents, including the drawings, were prepared by the Army Corps of Engineers. If they were ambiguous, that ambiguity should be resolved in favor of the other party to the contract. The plaintiff, having studied the'proposed contract documents for the purpose of preparing its bid, interpreted those documents as providing that payment would be made for the yardage of riprap actually placed within the limits of the stated tolerance of 6 inches. The riprap work had an estimated pay value of $952,600, and an experienced contractor such as plaintiff would not have lightly interpreted the proposed contract as it did unless the language and drawings were reasonably susceptible of that interpretation.
Section 4^05 of the contract specifications, quoted above, provided the method of measuring the work for pay pur *879 poses. It said that the work would be measured “in its final position.” If payment was to be made for only 18 inches of thickness, there would have been no occasion to measure anything except the perimeter lines of the area on which the riprap was placed. Possible exceptions to this statement would have been, first, a measurement finding a thickness of riprap of less than 18 inches. It seems, however, that as the riprap was placed, the Government’s agents saw to it that the minimum 18 inches thickness was complied with. If final measurement had disclosed a deficiency in this regard, presumably the contractor would have been required to supply this deficiency in kind rather than submit to a deduction from his pay. The other possible exception which occurs to us is that the sand and gravel blanket would have had to be measured, for pay purposes, since he would have been paid by cubic yards for any thickness from seven inches to eleven inches.
Section 4-05 of the specifications provided that the volume would be computed “by multiplying the surface area by the actual average depth of each layer * * That would indeed be an unusual way of saying that the computation of volume would be made “by multiplying the surface area by 18 inches” or “by multiplying the surface area by the required minimum thickness stated in the contract.” If the latter idea was intended, there was nothing “actual” nor “average” about it. It was well known to both parties that rock riprap of the prescribed size could not be placed with a uniform 18-inch depth. Furthermore, the Government wanted the surface to be irregular so that it would break the regularity of the wave action against the dam.
Defendant stresses the remaining words of the sentence from section 4-05 quoted above, viz: “within the neat lines as indicated on the drawings.” Defendant urges that the lines on the cross section drawing showed only the 9-inch thickness of the sand and gravel blanket, and the 18-inch thickness of the layer of riprap. The plaintiff replies to this contention by quoting the provision of Article 2 of the contract that anything mentioned in the specifications and not shown on the drawings “shall be of like effect as if shown or mentioned in both.” Plaintiff urges that the tolerances pro *880 vided in section 4-08 of the specifications sliow that tlie 18-incb line on tbe drawings, read in connection with the specifications, meant a line anywhere between 18 inches and 24 inches.
We are of the opinion that the words “actual average depth” cannot be explained away, and that the words “within the neat lines as shown on the drawings” are adequately reconciled with the rest of the sentence by the provisions of Article 2 requiring the drawings and specifications to be read together. Accordingly, we conclude that plaintiff was entitled, under the contract, to be paid for the yardage of rock actually placed, within the specified tolerance.
Defendant asserts that plaintiff has not proved the amount of the yardage of rock placed by it in excess of the 18-inch depth. Upon learning that the Government’s agents did not agree with its interpretation of the contract, plaintiff requested that the Government’s agents act jointly with plaintiff in measuring the depth of the riprap at a sufficient number of places to determine the average depth. The Government’s agents, however, feeling sure that their interpretation of the contract was the correct one, declined to participate in such measurements. Plaintiff then made its own measurements for all of the riprap thereafter placed, the area thereafter covered being 42.9% of the total area. The actual average depth in this part of the area was 22.4652 inches, resulting in a layer of riprap which was about iy2 inches less than the 6-inch plus tolerance allowed by the contract. In its claim to the contracting officer, and in this suit, plaintiff has applied that average depth to the entire area of the work. The kind of rock used and the method of placing was the same for the unmeasured area as for the measured area.
Defendant declined to participate in the measurement and has not contested its accuracy. Neither has defendant shown any reason why the 22.4652-inch figure obtained by actual measurement of 42.9% of the area does not fairly represent the average depth of the riprap in the entire area of the work.
On the basis of the record we conclude that plaintiff placed 40,196 cubic yards of rock for which it was entitled to be *881 paid at the rate specified in the contract. Judgment will be entered for the plaintiff in the sum of $224,378.00.
It is so ordered.
Holtzopp, Judge, sitting by designation; Laramore, Judge; Madden, Judge; and Jones, Chief Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Wunderlich Contracting Company, is a Nebraska corporation engaged in the general construction business, with its principal office at Omaha, Nebraska.
2. On November 18, 1947, defendant, acting through the Corps of Engineers, Department of the Army, entered into Contract No. W-05-016-Eng-47l with plaintiff for the construction of the earth embankment and spillway of Cherry Creek Dam and Reservoir on Cherry Creek, approximately 6 miles southeast of Denver, in accordance with the plans and specifications accompanying the contract. Work on the project was commenced in the spring of 1948 and was completed in January 1950.
3. Prior to submitting its bid, plaintiff made arrangements with the James & Phelps Contracting Company of Oklahoma City, Oklahoma, to assist it with the performance of the work in the event it was awarded the contract. In advance of the award of the' contract the proposed participation of James & Phelps in the work was made known to the district engineer and his representative who agreed to such an arrangement, and Mr. Guy Phelps of that company attended the bid opening with plaintiff’s chief engineer.
4. The contract contained the following articles which are germane to the instant claim:
article 2. Specifications and drawings. — * * * Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, *882 drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.
article is. Disputes.* — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 80 days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with the work as directed.
5. As a result of the performance of the contract, one claim was asserted by the plaintiff concerning the method of payment for the protective layer of broken rock, or riprap, placed on the upstream face of the earth embankment. Item 15 of the Schedule of Contract Items prepared by the defendant and paragraph SC-3 of the specifications entitled “Estimated Quantities” called for the placing of an estimated 173,200 cubic yards of riprap, for which plaintiff submitted a unit price of $5.50 per cubic yard, or $952,600.
6. Section 4 of the specifications, which covered the placing and measurement of the riprap, contained the following pertinent provision:
4-01. scope. The work covered by this section consists of furnishing all plant, labor and materials required to face the upstream slope of the dam with riprap, bedded on a sand and gravel blanket, and to plane riprap around the pressure relief well risers and to drain outfalls, all as indicated on the drawings and as herein specified.
* * * * *
4-03. placing riprap. The placing of riprap on the upstream face of the dam includes the placing of the riprap and the sand and gravel blanket. * * * The sand and gravel blanket and the riprap may be dumped and spread by mechanical equipment and arranged by hand, if necessary, to form a compact layer conforming to the lines and grades indicated on the drawings. Placement shall be kept within the following tolerances:
*883 Sand and gravel blanket, two inches + or — Riprap, six inches, + only
* # H: ❖ *
4-05. measurement. Material used in all work covered by this section will be measured in its final position. The volume will be computed by multiplying the surface area by the actual average depth of each layer within the neat lines as indicated on the drawings. No allowance will be made for misplaced materials.
7. The contract drawings, such as Drawing CC 4-10-5, which consisted of a cross-section at Station 90+00, called for the placing of 18 inches of dumped riprap on a 9-inch blanket of sand and gravel on all of the upstream face of the dam with the exception of the toe of the embankment. Because of the 2-inch plus or minus tolerance provided in paragraph 4-03 of the specifications for the sand and gravel layer, the contract requirements for this material could be met by actually placing a layer ranging from 7 to 11 inches in thickness. Similarly, the riprap layer was permitted to have a 6-inch plus tolerance only under paragraph +-08, with the result that the depth of this material could range from 18 to 24 inches.
It is plaintiff’s position that the phrase “neat lines” means the 9-inch and 18-inch dimensions for the blanket and rip-rap, respectively, as varied by the allowed tolerances. It is defendant’s position that the expression “neat lines” refers specifically to the 9-inch and 18-inch dimensions.
8. The size of the rock to be used as riprap was prescribed by paragraph 4r-02 of the specifications which established five weight gradations ranging from less than 300 pounds to spalls of less than 10 pounds. Under the provisions of paragraph 4-03, which called for the riprap to be “dumped and spread by mechanical equipment and arranged by hand, if necessary, to form a compact layer conforming to the lines and grades indicated on the drawings,” it was not possible to produce a layer of riprap, using stone of the sizes specified, that would have both a minimum and a maximum thickness of 18 inches. This material, when dumped and spread, would not assume a uniform surface, and, in order to produce such a surface, it would have been necessary to have used cut stone which, experience has demonstrated, *884 would not serve satisfactorily as riprap because it does not possess a sufficiently irregular surface to break up and dissipate the wave action of the water hitting the slope of the dam.
9. The plaintiff’s bid was prepared under the supervision of plaintiff’s executive vice-president George P. Leonard, who was assisted by its chief engineer Elmer B. Fontaine. Neither of plaintiff’s representatives had anything to do with the preparation of the plans and specifications, and the material contained therein was not discussed with representatives of the defendant in advance of the submission of plaintiff’s bid. However, plaintiff’s representatives did give consideration to paragraphs 4-01 through 4-06 of the specifications, and the drawings, as well as all of the other pertinent contract provisions, and based plaintiff’s bid on their interpretation of the meaning of such provisions.
■ 10. It is the custom in the construction industry to prescribe various methods of placing riprap. These include hand placing of the riprap, machine dumping and spreading, and various combinations of the two. It is also customary to provide that the riprap be placed to a reasonably uniform surface possessing a minimum and maximum thickness. Payment for the riprap is customarily made on the basis of either a theoretical thickness or an actual measured thickness. Where payment is to be made on a theoretical thickness, the quantity is customarily stated in square yards, and where payment is to be based on an actual measured thickness, payment is normally made on a cubic yard basis. However, defendant calls attention to the fact that paragraph 4-05 of the specifications defines method of payment for both the blanket and the riprap, and asserts that measurement in place is necessary as to the blanket, inasmuch as a 7-inch thickness would come within the allowed tolerances. The phrase “measured in final position”, as the same appears in paragraph 4r-05 of the specifications, is customarily interpreted in the construction industry as a final field measurement of the quantity of work installed.
11. The plaintiff in preparing its bid, concluded that it would be possible to grade the sand and gravel layer to a uniform thickness of 9 inches, and thus disregard the *885 2-inch plus or minus tolerances permitted under paragraph 4-03. In addition, the plaintiff concluded that the riprap placed under this contract was not required to be spread to a close tolerance, and in view of the wording of paragraph 4-05, would be measured in its final position and paid for on the basis of the actual cubic yards of material placed, including all material placed within the 6-inch plus tolerance. If the plaintiff had concluded that the specifications provided for payment to be made on the basis of a theoretical thickness of 18 inches, it would have substantially increased its unit price to cover the cost of the material within the 6-inch tolerance zone. On the basis of this conclusion the plaintiff’s bid contained a unit price of $5.50 per cubic yard for riprap, or approximately 40 cents per cubic yard less than the Government’s cost estimate of $5,909 per cubic yard.
In the preparation of its bid plaintiff understood that the statement in paragraph 4r-03 of the specifications to the effect that riprap layer must conform to the lines and grades indicated on the drawings, would have to be read in the light of the tolerance of 6 inches plus only which was permitted for riprap in that same paragraph. Plaintiff was also influenced, however, by the statement in paragraph 4 — 05 to the effect that material used in the work covered by the section would be measured “in its final position”, and was mindful that the established meaning of this language in the construction industry was that final payment for work installed would be based upon an actual field measurement after the work was acceptable. In addition, plaintiff noted the next sentence in paragraph 4^05 which stated that “the volume will be computed by multiplying the surface area by the actual average depth of each layer within the neat lines as indicated on the drawings,” and plaintiff was of the opinion that the only way to determine the actual average depth of each layer was by physically measuring them separately in the field.
With respect to the statement in paragraph 4-05 that “no allowance will be made for misplaced materials,” plaintiff thought the statement had reference to materials placed outside the general area designated for coverage by riprap. Accordingly, since riprap placed within the 6-inch plus permis *886 sive tolerance was not “misplaced”, and plaintiff made its bid with the expectation that it would be paid therefor.
It was plaintiff’s belief also that the phrase in paragraph 4-05 “within the neat lines as indicated on the drawings,” had no reference to the depth of the riprap but rather to the perimeter area shown in drawings CC4r-10-l and CC4-10-2 within which riprap was to be placed. Plaintiff also believed that the use in the specifications of the word “indicated” rather than the word “shown” was in anticipation of the possibility that the perimeter lines might be varied because of local conditions. Plaintiff did not believe that the phrase “neat lines” had reference to the depth of the rip-rap because plaintiff knew that riprap (rock) could not be placed to any precise and uniform depth and plaintiff was sure that the lines relating to riprap would have to be read in the light of the 6-inch plus tolerance which had been specified.
Plaintiff attempted to check the accuracy of the Government’s riprap estimate of 173,200 cubic yards, but it was not possible on the basis of the information available on the plans to accurately determine whether or not such estimate included materials within the 6-inch plus tolerance. The check which plaintiff did make revealed no large discrepancy between the quantity of riprap which it anticipated would be necessary and the quantity of riprap which had been estimated by the defendant.
12. A long haul was involved in obtaining part of the rock to be used as riprap and plaintiff also used rock encountered at the jobsite. In the course of excavating for the spillway, plaintiff encountered large boulders and saved them for testing and approval by defendant’s representatives. When approved, these boulders were broken up and used as riprap. Some boulders encountered in the excavation for the dam and in the borrow pits were also saved and used after approval by defendant.
The work of hauling riprap began in November 1948 and continued to January 1950. By July 20, 1949, plaintiff had been paid for 33,880 cubic yards of riprap in place, and 56,870 cubic yards in the stock pile, or a total of 90,750 cubic yards. As the riprap had not been dressed or finally accepted by *887 defendant as of July 1949, partial payments beginning on November 20,1948, bad been based upon an estimated quantity agreeable to both parties and no dispute had arisen with respect to the depth of the material which would be used for payment purposes. For the purpose of those estimates plaintiff had, with the knowledge of defendant, computed quantities from the load count tickets which were based on water level capacity of the trucks, plus an additional 1 y2 cubic yard per load for the heap loading of the trucks. However, a percentage of the entire partial payment estimate, including the riprap item, was retained by the defendant pending completion of the work.
In July 1949 the first dressing of riprap occurred and in comparing the riprap quantities proposed to be included in the estimate with the quantities prepared by defendant’s resident engineer, plaintiff’s chief engineer learned for the first time that defendant might make its computations on the basis of a theoretical thickness of 18 inches instead of on the basis of the actual average depth of the riprap as determined from field measurements taken in its final position. Initially, the assistant to the defendant’s resident engineer agreed with plaintiff that the contract required field measurements. Although there was tentative agreement at this point that the Government would join in the taking of all future measurements, upon taking the matter up with his District Officer, the Resident Engineer for the Government advised plaintiff’s chief engineer that it had been decided to make payment on the basis of an 18-inch thickness. Thereafter, in September 1949, plaintiff’s chief engineer began making field measurements of the actual depth of the riprap placed on the embankment and he recorded this information in a field notebook.
Plaintiff asked that the Government and plaintiff make common measurements in the field as to the riprap depth. The Government’s resident engineer and its acting chief of operations could not recall such request, but no common measurements were made. Plaintiff made actual measurements over only 43 percent of the job area and there was no physical reason why its measurements could not have been taken over the entire job. Since the Government, under its *888 interpretation of the method of payment, was interested only in seeing that plaintiff placed at least an 18-inch layer and did not exceed a 24-inch layer, it had no reason for measuring the exact thickness of the layer.
13. In the latter part of September 1949, plaintiff’s Chief Engineer Fontaine attended a conference in the Denver District Office with the contracting officer, Lt. Col. L. J. Lincoln, Herbert Leppich, Chief of Operations for the District, Jensen, Wolfe, and other representatives of the defendant, at which time Fontaine again made known that he desired to have progress payments based on the actual average depth of the riprap as measured in its final position, and again requested the Government to join with him in making joint measurements. Plaintiff was informed that these matters would be taken under advisement.
14. On September 29, 1949, the contracting officer wrote to plaintiff stating that the parties’ recent conference had revealed the existence of a question of fact which had to be decided by him. Accordingly, the contracting officer advised that he could not agree with plaintiff’s position with respect to paragraph 4-05, but that instead payment for all riprap would be made in accordance with the following interpretation :
The actual average depth of the riprap will be the average depth, within the neat lines indicated on the drawings, of the cross sections of riprap at each station. As the specifications do not permit an underrun of rip-rap, it would not be possible to have a condition where payment would be made for less than the depth shown within the neat lines on the drawing. If an overrun of riprap is placed by the contractor, payment for this overrun cannot be made by the Government, as this would not be within the neat lines shown on the drawing.
In response to this letter, the plaintiff, on October 24,1949, within the 30-day period prescribed by Article 15 of the contract, forwarded a written appeal to the contracting officer. The contracting officer acknowledged receipt of the plaintiff’s appeal by a letter dated October 31,1949, in which he requested plaintiff to state wherein it disagreed with his interpretation of paragraph 4-05, and to set forth its reasons therefor. By letter of November 14, 1949, plaintiff replied *889 to the contracting officer stating that a summary of its position was being prepared and that it would like to arrange a conference to discuss the matter further as soon as the summary had been completed.
On December 14, 1949, plaintiff’s chief engineer delivered to the contracting officer by hand a 3-page summary of its position with respect to the meaning of paragraph 4-05. Thereafter, on January 20, 1950, plaintiff notified the contracting officer that, pending a discussion of the matters set forth in its letter of December 13,1949, it was protesting the manner in which its partial-payment estimates had been computed, including the estimate dated January 20, 1950. In reply thereto, the contracting officer, on February 15, 1950, forwarded a written argument in support of his interpretation of the specifications, which argument was entitled “Findings of Fact,” and requested the plaintiff’s written comments. These arguments were responded to by plaintiff in letters dated February 23,1950.
15. By letter dated March 29, 1950, plaintiff was notified by the Corps of Engineers Claims and Appeals Board that its appeal of Octobed 24,1949, from the contracting officer’s decision had been received, docketed, and assigned Appeal No. 196. Thereafter, plaintiff was afforded a hearing before the Board which resulted in a decision dated May 6, 1952, denying its claim. It is conceded by both parties that these administrative proceedings did not possess finality under the contract.
16. Plaintiff used two methods of estimating the total quantity of riprap it had placed. One method involved the use of load counts of riprap brought to the site of the work, and the other involved the use of actual field measurements taken by plaintiff over 43 percent of the job, projected to the entire work upon the assumption that the riprap in the remaining 57 percent was placed at the same average depth.
Plaintiff claims all its trucks were heap-loaded and assumes they were all filled, not only to the water level content of the trucks, which ran from 10 to 12 cubic yards, but by an additional heap of iy2 cubic yards. While such a method of calculation may not be completely accurate, there is no evidence that it was not reasonably so and it is noted *890 that from November 20, 1948, to September 20, 1949, the Government consistently made progress payments which were in excess of the water level capacity of the truck loads delivered to the site within that period. In any event, although the results of the two types of measures used produced very comparable results, plaintiff used the more conservative method of projecting the average measurements made for 43 percent of the work over the whole area for pay purposes instead of utilizing the truck load count measurement which would have produced a higher figure for pay purposes. The load count method served to confirm the accuracy of the method actually used by plaintiff to determine pay quantities. The actual average depth resulting from plaintiff’s measurements in 42.9 percent of the total area was approximately 22.4652 inches and there is no evidence that this depth would not prevail over the unmeasured area. The same kind of rock was used and the same method of placing it was employed for the unmeasured area, as well as for the measured area, and it is reasonable to conclude that the figure obtained by plaintiff’s actual measurement of 42.9 percent of the total area fairly represents the average depth of the rip-rap throughout the entire area of the work. On the basis of plaintiff’s computation arrived at by projecting the average depth measurements taken over 43 percent of the job to the entire job area, plaintiff placed 40,796 cubic yards in excess of the 168,579 cubic yards for which it was paid. If it had realized sooner that the method of payment was in dispute, plaintiff could have measured the average depth of riprap over the entire surface of the embankment. At the contract rate of $5.50 per cubic yard plaintiff was not paid for 40,796 cubic yards, or a total sum of $224,378.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two hundred twenty-four thousand three hundred seventy-eight dollars ($224,378).