WILLIAMSBURG DRAPERY CO.

v.

The UNITED STATES.

No. 67–63.

United States Court of Claims.

Dec. 16, 1966.

Robert F. Rolnick, Washington, D. C., attorney of record, for plaintiff. Danzansky & Dickey, Washington, D. C., of counsel.

Thomas J. Lydon, Washington, D. C., with whom was Acting Asst. Atty. Gen. J. William Doolittle, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

---

* The court is indebted to Trial Commissioner Paul H. McMurray, from whose opinion, prepared at the direction of the court under Rule 57(a), we have liberally borrowed.

The facts are stated in the opinion. See, e.g., Farnsworth & Chambers Co. v.

## OPINION

### PER CURIAM.*

In this suit to review a decision by the Armed Services Board of Contract Appeals, the Government's main contention is that the action should be dismissed, without consideration of the merits, on the ground that the plaintiff-contractor failed to present to the trial commissioner an adequately detailed challenge to the Board's findings and determination. The commissioner rejected this course, passed to the substantive issues, and then recommended dismissal of the petition on the merits. The defendant urges us now to do what it thinks the commissioner should have done in the first instance—by-pass the merits and bar the door to plaintiff for failure to proceed properly in this court.

The claim involves the termination of a drapery supply contract for housing units at the United States Air Force Academy, Colorado Springs, Colorado. On August 22, 1958, plaintiff and defendant entered into Contract No. AF 05 (611)–691 for fabrication of 40 items of draperies constituting 8,353 units. The contract called for delivery of the first one-fourth of the units not earlier than November 15, 1958, and not later than January 15, 1959, with each additional one-fourth allotment to be delivered in succeeding periods of 2 months each, the entire contract to be completed by July 15, 1959.

On December 30, 1958, the contracting officer terminated 14 contract items under subparagraph (a) (ii) of Clause 11, "Default," of the general provisions of the contract. On February 3, 1959, 22 of the remaining 26 items were terminated for default under subparagraph (a) (i) of the default clause. One unit was terminated for the convenience of the Government under paragraph (e).[1]

United States, 346 F.2d 577, 171 Ct.Cl. —— (1965).

1. The pertinent portions of the default clause are as follows:

"11. DEFAULT

"(a) The Government may, subject to the provisions of paragraph (c) below,

Plaintiff appealed the default terminations to the Armed Services Board of Contract Appeals, alleging that its failure to meet the contract requirements on delivery was due to various arbitrary and unreasonable actions of defendant's contracting officers; that the plaintiff was without fault or negligence; and that the terminations should be deemed terminations for the convenience of the Government under paragraph (e) of the default clause.

After a hearing, the ASBCA, in a decision dated July 27, 1961, denied plaintiff's appeals. The ASBCA rejected all of plaintiff's contentions except one, relating to a claim that extra time should have been allowed because defendant's contracting officers required plaintiff to handstitch pleats. The panel concluded that, even allowing extra time to handstitch pleats, plaintiff was unable to meet the contract requirements for delivery because of failure to take timely action in procuring material and scheduling production.

### I.

On March 5, 1963, plaintiff brought suit in this court, alleging that the decision of the ASBCA panel was erroneous and that it was entitled to judgment in the sum of $90,927.95. The defendant, on October 9, 1964, moved that the trial commissioner issue an order "requiring disposition of the case on the basis of the administrative record only." The motion was allowed by the commissioner on October 22, 1964. Under the rationale of Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965), where relief is available to a contractor under the "Disputes" clause of a contract, the contractor is not entitled to a trial de novo on the factual questions decided administratively. Plaintiff invoked the "Disputes" clause in presenting its case before the ASBCA, and has not attempted to show that any aspect of relief was not available to it in an administrative decision under the "Disputes" clause. This case is clearly one where a de novo trial is not available and the commissioner properly refused to receive de novo evidence.

Plaintiff and defendant were directed by the trial commissioner to submit requested findings based on the administrative record, together with a brief based on the facts and the law of the case. Plaintiff filed its proposed findings of fact without citation to the administrative record, as is required by Rule 57(c)(1). In lieu of submitting a brief to the commissioner, it referred the commissioner to its brief filed before the ASBCA, which is a part of the administrative record.

Defendant attacked the plaintiff's submission on three procedural grounds. First, defendant stated that plaintiff made the naked allegation in its petition

by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

\* \* \* \* \*

"(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor or subcontractor pursuant to the provisions of paragraph (c) of this clause, such notice of default shall be deemed to have been issued pursuant to the clause of this contract entitled 'Termination for Convenience of the Government,' and the rights and obligations of the parties hereto shall in such event be governed by such clause. (Except as otherwise provided in this contract, this paragraph (e) applies only if this contract contains such clause.)

\* \* \* \* \* "

that the ASBCA decision was "erroneous" and in its proposed "Conclusion of Law" that the ASBCA decision was "arbitrary, capricious, and not supported by substantial evidence." Since the plaintiff failed to point out specifically the errors committed by the ASBCA, defendant urged that this was a fatal defect (citing Volentine and Littleton v. United States, 145 F.Supp. 952, 136 Ct.Cl. 638 (1956), and Pyle v. United States, 163 F.Supp. 853, 143 Ct.Cl. 339 (1958)). The commissioner thought, however, that the petition sufficiently alleged the challenged errors in the ASBCA decision, and did not require amendment.[2]

The defendant also complained of plaintiff's failure to allege specific administrative error in its requested findings of fact, but the commissioner felt that such a showing was better left to the briefs; although in this case the plaintiff simply filed its ASBCA brief, this infirmity was not deemed to be fatal.

Another of the Government's attacks was on the plaintiff's failure to include record support for its proposed findings, in violation of our Rule 57(c) (1). The commissioner recognized the force of this contention but concluded nevertheless "that the various contentions raised by plaintiff before the ASBCA and rejected by it were delineated to the extent that

they can be scrutinized in order to determine whether the ASBCA findings were supported by substantial evidence." Report of Comm'r, p. 5.

■ Although the defendant strongly urges us to dismiss the petition, even at the present phase of the litigation, on these same grounds urged below, we cannot say that the trial commissioner abused his discretion in proceeding to review the administrative decision on the merits. The court has often said that contractors should be specific in challenging the findings of a board, and that the court cannot be expected to plough through a record for itself without adequate record references and sufficiently detailed challenges to the administrative findings.[3] We do not retreat one iota from that position, and we do not encourage the commissioners to gloss over too-general or inadequately supported attacks on board findings. But the rule is one of discretion and not an iron rule of law, and where a trial commissioner has exercised his discretion to overlook or excuse defects in a plaintiff's presentation, we will not say—especially after the review on the merits has been made [4]—that an error of law has been committed, unless that discretion was plainly abused. Conversely, where a commissioner has refused to countenance

2. The commissioner said: "Contrary to defendant's position, the petition does not make a mere naked allegation that the ASBCA decision was incorrect. It sets out certain factual contentions which, according to plaintiff's view, establish that defendant caused delays resulting in termination. From this plaintiff argues that the delay was beyond its control and the termination should have been for the convenience of the Government. Although plaintiff does not specifically so state in its petition, the necessary implication from the foregoing, together with the allegation that the ASBCA decision was 'erroneous', is that, to the extent the ASBCA rejected plaintiff's various factual contentions, its decision was not supported by 'substantial evidence.' Since such an implication flows naturally from the factual allegations of the complaint, an amendment is not deemed necessary." Report of Comm'r, p. 4.

3. E.g., Schmoll v. United States, 63 F. Supp. 753, 758, 105 Ct.Cl. 415, 456, cert. denied, 329 U.S. 724, 67 S.Ct. 69, 91 L. Ed. 627 (1946); Manufacturers' Casualty Ins. Co. v. United States, 63 F.Supp. 759, 760–761, 105 Ct.Cl. 342, 351 (1946); Societe Anonyme DES Ateliers Brillie Freres v. United States, 160 Ct.Cl. 192, 202 (1963); Hunt & Willett, Inc. v. United States, 351 F.2d 980, 983, 168 Ct.Cl. 256, 260–261 (1964); H. R. Henderson & Co. v. United States, 169 Ct.Cl. 228, 235 (1965); Jefferson Constr. Co. v. United States, 177 Ct.Cl. ——, ——, 368 F.2d 247 (Nov. 1966).

4. Methods are available to the defendant for obtaining a timely court ruling, prior to the commissioner's going into the merits, on the propriety of the contractor's challenge to the administrative determination.

such infirmities, we will not set aside his judgment unless he acted arbitrarily. See Noonan Constr. Co. v. United States, Ct.Cl. No. 329–64, Order of Nov. 14, 1966. In this instance, the commissioner reached the merits over objection, and his detailed views both on the procedural issues and on the merits are before us; at this stage of the case, we cannot find that he so abused his discretion as to preclude our examination of the merits.[5]

## II.

*A. First Article Changes and Approvals:* Part 13(a) of the contract required that one first article had to be submitted and approved by defendant's contracting officer before the remaining contract items could be fabricated or produced. A conference was held at the Academy during October 15–17, 1958, between plaintiff's president, Mr. Shayman, and defendant's contracting officer, Mr. Moncus, and other Academy personnel interested in the contract. At the time of the conference, the plaintiff had already submitted for approval the single first article required by the contract. After the conference was scheduled, the parties executed Supplemental Agreement No. 2, which provided, *inter alia,* that the number of first articles was increased from 1 to 11.

An analysis of the substituted first article requirement shows that it was intended to provide examples for each of the several groups of fabric differing in content and pattern.[6] The evidence with respect to who proposed the first article change and who benefited from the change is conflicting. There is sharp conflict at several points between the testimony of defendant's employees and Mr. Shayman's testimony. Although the ASBCA was not explicit in its decision,

on most points it accepted defendant's view of the case, and inferentially, at least, accepted the testimony of defendant's employees (called as witnesses by plaintiff), rejecting Mr. Shayman's testimony.

In reviewing an administrative determination, the ASBCA had an opportunity to observe the demeanor of the witnesses, while this court looks only to a "cold record." NLRB v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). Therefore, this court should accept the ASBCA evaluation of credibility, unless the testimony accepted is inherently improbable or discredited by uncontrovertible evidence or physical fact.[7] Where two versions of the facts are equally probable, this court would normally be constrained to favor the version accepted by the ASBCA. Carlo Bianchi & Co. v. United States, 167 Ct. Cl. 364 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965).

The ASBCA concluded that the increase in number of first articles benefited both plaintiff and defendant and was therefore supported by consideration, and that the contract as amended allowed the plaintiff to begin fabrication of each related group of articles when the first article for such group was approved.

Plaintiff argues, in effect, that the ASBCA decision has no support in the evidence or in terms of plain common sense or logic. But one of the defendant's contracting officers testified that, in the light of previous experience with drapery contracts, the principal purpose for making the change was to enable the plaintiff to get an acceptable article approved before going into mass production and assuming the risk of fabricating

---

5. Defendant also disputes the commissioner's use of requested findings of fact in a case in which there is no de novo evidence but only a Wunderlich Act review of the board's decision. Whether or not this mechanism is generally appropriate or desirable in this kind of case, it is clear that defendant's presentation was not harmed by its use here.

6. After the fabric changes of October 17, 1958, there were four different types of fabric content: fiberglass, cotton rayon, linen, and linen-spun rayon. The fiberglass comprised eight different patterns.

7. See generally, Jaffe, Judicial Review, Question of Fact, 69 Harv.L.Rev. 1020, 1031 (1956).

large numbers of unacceptable items. This explanation is certainly not inherently improbable and ridiculous, as plaintiff has implied.

Plaintiff failed to adduce any evidence contradicting this testimony. Plaintiff's position before the ASBCA was that it had absolutely no idea why the additional first articles were required. If the need for additional first articles was not understood by plaintiff, its complacent acquiescence in the requirement would seem even more incomprehensible.

Mr. Shayman testified that he asked for and received an oral commitment that he would get extra time to complete the contract. The contracting officer categorically denied that any such request had been made to him.

Defendant's position is strengthened by reference to the letter sent to defendant by plaintiff on November 4, 1958, shortly after Supplemental Agreement No. 2 was signed, wherein Mr. Shayman indicated that all first articles would be produced within a week of that date. The letter gives no indication that plaintiff felt at that time that the additional first articles would prolong the overall time required for fabrication.

Plaintiff claims that defendant's letter of October 17, 1958, to the plaintiff shows that the change was unilateral. The letter shows nothing of the kind. The portions of the letter relating to contract specifications merely confirm the agreements which had been reached earlier as a result of the discussions at the Academy. There is nothing in the letter to show which party initiated the discussions on specification changes.

Plaintiff also attempts to buttress its argument by taking the position that, but for the additional first article requirement, it would have been able to begin production in October 1958 because the initial first article had been approved by defendant before it imposed the additional requirements on plaintiff. Disregarding the fact that plaintiff, at that time, did not have the necessary fabric to begin quantity production,[8] the initial first article submitted by plaintiff had *not* been approved when the discussions leading to the first article increase took place. The first article was approved by the letter of October 17, 1958, which was sent to plaintiff at the conclusion of the discussions. Therefore, plaintiff was not in a position to proceed with fabrication prior to the agreement on first article increase, the approval having been contemporaneous with the increase.

Plaintiff also asserts several alternative theories to show that it was prevented from fabricating because the first article changes delayed it: (1) that it could not fabricate any items until all 11 first articles were approved; or (2) that it could only fabricate the item relating to each specific first article as each first article was approved, and it could fabricate the items which were not first article items only when all first articles were approved; or (3) if it could fabricate each group of items when the first article containing the fabric and pattern for the group was approved, the defendant unreasonably delayed approval of certain first articles and thereby prevented plaintiff from promptly fabricating certain groups of items.

The contract language in dispute as set out in Supplemental Agreement No. 2 is as follows:

(a) The first completed article of Items 1, 6, 8, 11, 18, 23, 29, 35, 37, 39 and 40 is designated as a First Article and shall be delivered by the Contractor to the Government, all transportation charges prepaid, not later than 1 December 1958. The Contracting Officer will give to the Contractor within 10 days after receipt thereof a notice in writing either approving or disap-

---

8. In a survey taken by defendant on December 29, 1958, plaintiff still had no suitable fabric in production quantities for 14 of the 40 items. Plaintiff's own records show that it ordered production quantities of only three items during the month of October 1958 and that only token quantities of these three items had been received when they were cancelled by the defendant on December 30, 1958.

proving the First Article. After inspection, said article shall be returned to the Contractor, at the Contractor's expense, for submission as a contract item after repairs and modifications, if necessary, have been made by the Contractor. Pending written approval of the First Article the remaining items of the contract shall not be fabricated or produced but the Contractor may acquire necessary materials for fabrication.

The last sentence is quite ambiguous and supports either of the three interpretations raised by plaintiff. Plaintiff argues that since the language is ambiguous, it should be strictly construed against the defendant and the first interpretation should be adopted.

■ Again, putting to one side the fact of plaintiff's lack of material to fabricate many of the items,[9] plaintiff is correct in its assertion that where contract documents prepared by the Government contain an ambiguity, the ambiguity should be resolved against the defendant. Wunderlich Contracting Co. v. United States, 166 F.Supp. 741, 143 Ct.Cl. 876 (1958). However, if the parties by their later actions and communications indicate that they gave a specific interpretation to it in practice, that interpretation will be given great, if not controlling, weight. Central Engineering & Constr. Co. v. United States, 59 F.Supp. 553, 103 Ct.Cl. 440 (1945); Crown Coat Front Co. v. United States, 292 F.2d 290, 154 Ct.Cl. 613 (1961).

It is clear that the first, most strict, interpretation was not the interpretation of either party. The letters sent by defendant to plaintiff approving the several first articles authorized the plaintiff to proceed with fabrication of the item covered by each first article. In none of the

correspondence leading up to the first termination did plaintiff indicate that it felt that the contract change prevented it from proceeding with fabrication of the contract items until all first articles had been approved. It is difficult to believe that the plaintff would have failed to advance this as a reason for its failure to proceed expeditiously if it had in fact so interpreted the contract. In addition, plaintiff's letter to defendant on December 15, 1958, shows that plaintiff had not planned to begin extensive production before January 1959. Plaintiff's present contention that the contract prevented any production before all first articles were approved appears likely to be an after-the-fact issue, rather than a problem looming large throughout the contract period.

The second interpretation raises more of a problem, since defendant's production authorizations, on their face, gave plaintiff authority to proceed only with the specific item covered by the approved first article, rather than the group of items of the same fabric pattern. However—in view of the foregoing discussion on the first interpretation; plaintiff's failure to adduce any substantive evidence to show that it had so interpreted the contract; the lack of fabric;[10] and the testimony of defendant's employees showing that the purpose of the additional first articles was to produce samples for the several groups of fabrics and patterns—the third interpretation is considered to be the most reasonable and the interpretation actually given the contract provision.

Other delays are alleged to have resulted from defendant's failure to promptly approve first articles submitted to it. Plaintiff first points out that five first articles were approved between November 25, 1958, and December 4, 1958,[11]

---

9. See fn. 8, supra.

10. Plaintiff had received no fabric in production quantities prior to December 1958. Between December 1, 1958 and December 14, 1958 production quantities of fabric for only four items, Nos. 31, 33–35, were received by plaintiff.

11. Nos. 23, 35 and 40 approved by letter of November 25, 1958, and Nos. 37 and 39 approved by letter of December 4, 1958.

and claims that defendant's delay in approval gave him only approximately 45 days for prodution of the groups of items covered by these first articles.[12] The fatal flaw in plaintiff's argument is that it assumes, without proof, that a relatively late approval shows, per se, an unreasonable delay. There is nothing in the record to show when the first articles in question were submitted by plaintiff. Mr. Moncus testified that defendant never exceeded the 10-day period allowed it under the contract to accept or reject the submissions. In fact, the usual practice was to inspect the submission on the day it was received. No evidence was advanced to rebut this testimony. In view of plaintiff's failure to close this gap in its chain of evidence the contention that defendant unreasonably delayed approval of these items is not established.

Plaintiff also claims that defendant erroneously interpreted the contract provision on discrepancies and therefore approval of First Articles Nos. 6 and 8 was delayed from December 11, 1958, until December 29, 1958. This presumably delayed production on the group of items covered by these first articles.[13] Again, plaintiff had only token quantities of material on hand when the defendant cancelled this group of items on December 30, 1958, and was clearly in no position to begin quantity production. Plaintiff cannot blame the defendant for the lack of fabric, since the contract, Part 13(a), clearly gave the contractors the right to accumulate fabric prior to first article approval, and there were no fabric changes for any of these items. The contract language on discrepancies reads as follows:

*PART 13—FIRST ARTICLE APPROVAL*

\* \* \* \* \* \*

(e) If, following any submission or resubmission under this clause, the tests reveal discrepancies in the First Article from the specification requirements, the Government may, at its option, either (i) terminate this contract in accordance with the terms of (a) (i) of the clause hereof entitled "Default", or (ii) notify the Contractor in writing of the discrepancies and specify an extension of the time set forth in (a) above, in which event the Contractor shall correct and resubmit the First Article at no cost to the Government.

Plaintiff's position before this court seems to be that defendant, by rejecting First Articles 6 and 8 and requiring plaintiff to rework and resubmit them, breached the contract as impliedly amended by defendant, and delayed plaintiff's performance. Before the ASBCA, plaintiff argued that defendant's rejection without authorizing production was a violation of the terms of Part 13(e), supra. That patently erroneous contention has apparently now been abandoned.[14] The disapproval is now claimed to be unreasonable on the ground that defendant changed its procedure. Apparently the argument is that defendant, having previously ignored the contract provision on resubmission, either waived the express terms of the contract or modified the contract informally.

There is no estoppel or waiver here, since the plaintiff has not detrimentally changed its position in reliance on defendant's actions. Williston on Contracts, §§ 140, 679 (3d ed.) Neither could there be a contract modification. The plaintiff has furnished no consideration for such a modification; no modification would arise simply because the defendant, as here, unilaterally benefited plaintiff by, for a time, ignoring the contract terms.

*B. Fabric Changes:* Plaintiff also claims that it was delayed in producing Items 1, 2, 4, 26–30, and 40 because defendant: (1) was dissatisfied with the

---

12. Items 21–25, 31–40.

13. Items 5–8.

14. Before the ASBCA plaintiff based its argument purely on a reading of the terms of Paragraph (e), Part 13, ignoring completely Paragraph (a), Part 13, which expressly prohibits fabrication prior to first article approval.

fabric specified initially in the contract necessitating substitutions; and (2) delayed in formally authorizing plaintiff to proceed with fabrication until December 31, 1958, giving plaintiff only 15 days, including Sundays and holidays, to fabricate the units needed to meet first quarter requirements.

The ASBCA found that: (1) plaintiff had recommended the fabric changes and at the time fabric substitution was agreed upon had not yet ordered the fabric originally specified; (2) plaintiff delayed submission of first articles, color swatches and fabric samples, such submission being entirely within its control; and (3) plaintiff received written authorizations to proceed with fabrication at appropriate times, and therefore lack of a formal contract amendment was not a cause of plaintiff's failure to make timely delivery of the first one-fourth of the items.

Mr. Shayman testified that defendant's contracting officers were dissatisfied with the Polaris pattern, to be used for Items 26–30, and the Avondale pattern for Items 1, 2 and 4. He suggested, as substitutes, Virginia Boucle for the Polaris and Raleigh for the Avondale. Mr. Moncus testified that Mr. Shayman initiated the discussions on fabric changes. The ASBCA stated "the record here preponderates in favor of a finding that appellant [plaintiff] itself recommended them [the fabric changes]." If the ASBCA meant that plaintiff suggested the specific fabric changes, it merely found as a fact a matter which was undisputed. If it was making a finding that plaintiff initiated the discussion of changes, the reference to the preponderance of the evidence means that it accepted Mr. Moncus' testimony in preference to that of Mr. Shayman. As previously stated, there appears to be no sound or proper basis for this court, on review, to upset that choice.

By letter of October 17, 1958, Mr. Moncus confirmed the agreed-upon fabric changes, and stated that, after the colors of the substituted fabrics had been approved, the contract would be amended to allow use of the Raleigh and Virginia Boucle patterns. He also stated that the contract would be amended to allow fabric substitution for Item 40. On December 31, 1958, defendant sent plaintiff a letter saying that formal contract amendments were not necessary, the substituted fabrics being "approved equals" of the fabrics specified in the contract.

Plaintiff claims it was unable to go into production of the items in question until December 31, 1958, because of defendant's failure to change the contract. The First Article for Item 1, which covered Items 1, 2 and 4, was approved on October 17, 1958, with certain discrepancies noted which were to be corrected on all production items. Plaintiff submitted color swatches for the above items to Mr. Moncus on November 12, 1958. Color approval was granted on November 14, 1958. Plaintiff then had to submit 1-yard fabric samples, as required by Amendment No. 1 to the Bid Invitation. Plaintiff ordered the fabric for these items on December 10, 1958. It submitted the fabric samples sometime after December 22, 1958; they were approved on December 31, 1958.[15] It appears that the principal delay on the above items was due to factors under plaintiff's control, specifically: (1) color swatches were not submitted until almost a month after first article approval; and (2) almost another month elapsed before plaintiff ordered the fabrics from the supplier. Plaintiff could not engage in production until it received fabric, and the delay in receiving fabric was not occasioned by factors within defendant's control. Since, because of factors within its control, plaintiff could not have begun production until December 26, 1958, it is found that plaintiff's claim was properly rejected. Defendant allowed plaintiff to proceed without a formal contract change when it approved the fabric samples; however, this does not indicate that de-

---

15. The contract does not specifically require approval of submitted fabric samples prior to production, but apparently this practice was followed by the parties.

fendant was dilatory; rather, it shows that defendant was quite prompt in allowing plaintiff to proceed.

The fabric samples and the First Article for Item 40 were approved by a letter dated November 25, 1958. The approval letter specifically authorized plaintiff to proceed with production of Item 40. If plaintiff felt that this was not sufficient authorization to proceed, it could and should have raised the issue with defendant. Instead, saying nothing, it waited more than 3 weeks after receiving fabric and first article approval before placing a fabric order. It received fabric on December 23, 1958. Even accepting plaintiff's claim that in good faith it did not consider the letter of November 25, 1958, to be sufficient authorization to proceed, the greatest possible delay that could be charged to defendant was the 8-day period from the date of receipt of fabric to December 31, 1958. Item 40 was cancelled by the defendant on February 3, 1959, more than 15 days after plaintiff was supposed to make delivery of the first one-fourth of all items. During the month of January 1959 plaintiff produced no units of Item 40. Unless, in conjunction with other delays, plaintiff was delayed more than 15 days, it still would not have good cause for complaint. As later discussion will show, plaintiff cannot show that it was delayed more than 15 days.

Items 26 through 30 received color approval on November 25, 1958. The First Article for Item 29, which covered Items 26–30, was submitted to defendant on or about December 23, 1958.[16] The first item was disapproved, in a letter of December 26, 1958, but the contractor was authorized to proceed with production. At that time, plaintiff claimed that its failure to make a timely submission of this first article resulted from late color approval. However, before the ASBCA plaintiff claimed that its delay

in first article submission was the result of defendant's failure to make a specific contract amendment.

Taking the last ground first, plaintiff's position is untenable because: (1) it did not wait for a contract amendment before proceeding with the first article; and (2) it failed to mention this at the time of delay as a reason for delay. There is unquestionably substantial ground for holding that the lack of a contract amendment was not considered at the time to be an obstacle to production of the first article. This conclusion is reinforced by plaintiff's submission of a First Article for Item 40 in November, over a month earlier, the contract never having been amended for the fabric change of that item.

With respect to the question of the original claim, that defendant delayed color approval, the responsibility for any delay in color approval was never pinpointed. Plaintiff failed to produce any probative evidence of delay, relying solely on the argument that the late approval, per se, showed delay. The record supports a finding that the inspection of items submitted was accomplished promptly after they were received. Color approval for another changed pattern was granted 2 days after the samples were sent. The relative lateness in granting color approval could have been the result of delayed submission of color swatches or the result of delay which occurred after the swatches were submitted for approval. Since plaintiff failed to produce any evidence on this question, it has not met its burden of persuasion, and the ASBCA decision must be upheld.

*C. Handstitching of Pleats:* The ASBCA held that defendant's contracting officer had erroneously interpreted the contract in taking the position that the contract required handstitching of the drapery pleats. The Board agreed with

---

16. Plaintiff stated in a letter of December 15, 1958, to the Academy Director of Procurement that the First Article of Item 29 would be shipped on December 23, 1958. Mr. Moncus testified that a note in his file indicates he inspected the first item on December 23, 1958. It was his practice to examine such items on the day they were received.

plaintiff that this interpretation was, in effect, a unilateral change order, but did not accept plaintiff's claim that the handstitching added 5,200 hours to the production time needed to complete the contract. Plaintiff's calculations were based on an assumption that the handstitching resulted in additional labor time of 38 minutes per unit. The ASBCA found that the necessary additional time was only 15 minutes per unit, and calculated plaintiff's time extension accordingly.

The interpretation of the contract specifications is, as previously pointed out, a legal question, to be decided without resort to the "substantial evidence" test. However, in making this legal decision, some factual questions may arise. To the extent that any such subsidiary problems are decided on the basis of evidence, the ASBCA view of the evidence must be upheld if substantially supported.

The original set of contract specifications (AFA–90) covered curtain Types I and II. The curtains produced under the instant contract were Type III. Paragraph 1.2.1 of Addendum 1 to AFA–90 provided:

> 1.2.1 This addendum provides specifications, schedules and details covering certain curtains for residential use. The requirements of the basic specification apply for these additional curtains except as they are modified or expanded by the following paragraphs (numbered to agree with those of basic specification); paragraphs which are obviously not applicable to curtains of the type covered are not specifically excepted herein. It consists of 1 written page, a 3-page addition to Table I, a 1-page addition to Table II, a 3-page addition to Table III and Figs. 5, 6 and 7.

Therefore, the basic specifications of AFA–90 applied to Type III curtains, except where modified by Addendum 1 or where the AFA–90 specifications were obviously not applicable.

The dispute arises because Figures 3 and 4 of AFA–90 show the front edge of the pleat with handstitching. Figures 5 and 6, supplied with Addendum 1 and specifically applying to Type III curtains, do not specifically show handstitching on the front of the pleat.

The most favorable view which can be taken of the contract is that, on this point, the specifications are ambiguous. There is certainly some merit in plaintiff's argument that it did not have to look to Figures 3 and 4 when Figure 3 specifically applied to Type II curtains and Figure 4 covered lining details, the curtains produced here being unlined. It is settled law that where contract specifications are ambiguous, the ambiguity is resolved against the author of the specifications, here the defendant. Lilley-Ames Co. v. United States, 293 F.2d 630, 154 Ct.Cl. 544 (1961); Wunderlich Contracting Co. v. United States, supra.

The defendant has raised a point which it says should militate against the above conclusion. This is that plaintiff knew of the defendant's position on handstitching prior to the award of the contract; it bid with full knowledge of the defendant's requirement, and therefore it cannot now complain that the contract was interpreted incorrectly by defendant or was ambiguous.

This point is founded on the testimony of Mr. Paul, an inspector for defendant, that the First Article for Item 1 was handtacked and the testimony of Mr. Moncus that he had discussed the handstitching requirement with Mr. Shayman before the contract was awarded. Mr. Shayman testified that the First Article for Item 1 was originally machine stitched, but that it was redone with handstitching by order of Mr. Moncus. He protested the handstitch requirement, but acquiesced in it and proceeded to make the first article with handstitching.

It must be assumed from its decision that the ASBCA considered the above-mentioned evidence and accepted Shayman's version as more credible. This view is not unreasonable and therefore will not be discarded.

In testifying that First Article No. 1 was handstitched, Paul could have been referring to either the initial first article

or the redone first article which was submitted to the Academy. Therefore, his testimony is not necessarily in conflict with Shayman's. The acknowledged fact that Shayman protested the handstitching is more compatible with his version of the facts. It seems highly unlikely that a contractor would wait over a month after it had specific knowledge of a contract interpretation with which it disagreed before protesting that interpretation.

The ASBCA found that 15 minutes additional time was required to handstitch the pleats. The plaintiff argued that the change required 38 minutes additional time. Using the 15-minute figure, the ASBCA calculated that plaintiff should have been granted 5 additional work days to complete the original contract, and no more than 4 additional work days for the reduced increment to be produced after the first termination. The testimony of plaintiff's shop supervisor provided the basis for the calculations. As the ASBCA points out, her testimony is confusing and somewhat contradictory. Therefore, there appears to be no sound basis, and plaintiff has pointed out none, for upsetting the ASBCA calculation of the time requirement.

*D. Bottom Hems:* Before the ASBCA, plaintiff alleged that the bottom hem change agreed upon at the October 15–17, 1958, conference had been forced upon it and required an increase in manufacturing time; that it was in effect a unilateral change without consideration; and that plaintiff should have received an extension of delivery time because of this change.

The ASBCA did not consider the substance of plaintiff's claim, dismissing it on the ground that Supplemental Agreement No. 2 benefited plaintiff, and therefore there was consideration for the agreement. The Board further stated that the validity of the agreement did not depend on the adequacy of the bargain; it did not consider the adequacy of consideration.

The ASBCA view of the agreement is entirely too narrow and formalistic. Al-

though it is true that a single obligation or benefit can support several promises on the other side of the bargain, this does not mean, as the ASBCA infers, that a single benefit necessarily supports all the promises on the other side. Williston on Contracts, § 137A (3d ed.). A promise or benefit may run to only one portion of the contract, and therefore the contract would be divisible as to that portion.

The two principal contract modifications in Supplemental Agreement No. 2 involved: (1) the first article increase, and (2) the hem change. The ASBCA found, and it has been upheld here, that consideration supported the first article increase because the plaintiff benefited from a decreased risk of having production items rejected.

This benefit clearly runs only to the first article increase, and has no connection whatsoever with the hem change. There has been no allegation that the hem worked out differently on different patterns, and thus needed to be tested on the the the various patterns. There is no practical or logical connection between the two changes. A form of consideration unique to one modification should not be imported into another quite different modification on the purely formalistic ground that the two modifications were embodied in one agreement.

Having dismissed plaintiff's claim on a legal ground, the ASBCA did not inquire into the underlying substantive questions, i. e., whether plaintiff was entitled to an extension of time because the change was forced upon it (without any benefit to it) and because it requested such an extension. The court has no factual decision upon which to base a "substantial evidence" analysis. And the record does not show that the Board would have had to find only one way if it had reached the substantive issue. The testimony is conflicting on the question of who requested the hem change and whether an extension was sought. In making a decision based largely on conflicting testimony, the demeanor of the witnesses is, of course, very important.

Since this court has not observed the witnesses, it is necessarily unable to make an informed decision.

In these circumstances, this item will have to be referred to the ASBCA to make the necessary findings of fact. See United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed. 2d 662 (1966); Aircraft Associates & Mfg. Co. v. United States, Ct.Cl., 357 F.2d 373, Order of October 28, 1966; J. A. Jones Constr. Co. v. United States, Ct.Cl. No. 337–61, Order of October 31, 1966.

*E. Batons:* Plaintiff alleged in its petition that defendant's contracting officer refused to approve batons which satisfied contract specifications.

Defendant's contracting officer clearly changed the contract specifications by requiring that the batons have pinch heads, rather than swivel heads. But plaintiff is not entitled to an automatic extension of time because a change was made. It is only entitled to an extension if the change resulted in delay. The record supports the ASBCA finding that plaintiff has failed to show that any delay resulted from the change, beyond that caused by its own negligence.

The baton specification provided, in Par. 3.3.3 of AFA–90:

> 3.3.3 *Batons.*—Length and number of batons for each curtain unit receiving same shall be as indicated on Table I. Batons shall be similar or equal to baton, with ⅜ inch diameter, chrome plated steel shaft and swivel head, as sold by The Gould-Meserau Co., Inc., or Jiffy Join, Inc.; except that the handle shall be all rubber to provide protection against glass breakage. The rubber handle shall be molded from light gray, medium density natural rubber and securely held to steel shaft.

The specification indicates that the rubber handle desired for the baton was not standard for the type of baton requested. Since plaintiff was on notice that a nonstandard handle was desired, its failure, before bidding, to inquire into possible sources for the handle is its own fault. It submitted several batons with handles smaller than the wooden Gould-Meserau one, before having a mold specially prepared. As the delay in getting handles was a result of its own negligence, and it has failed to show that it was further delayed by the specification change or failure to get suitable shafts from the named suppliers, its claim of a defendant-caused delay must fail.

*F. Backstitching:* On November 11, 1958, the First Article for Item 18 was approved with several discrepancies noted, among which was incomplete backstitching on two pleats. Before the ASBCA, plaintiff argued that backstitching was not required by the contract, and that the backstitching requirement was another unilateral change order which increased the time required to complete the contract. The ASBCA rejected plaintiff's argument on the grounds that: (1) the record showed that backstitching was implicitly required by the contract because it was part of normal procedure in making a good curtain; and (2) that plaintiff had backstitched the pleats on its own initiative and without any direction from defendant.

The record gives substantial support for the ASBCA position. It is clear from the context of the November 11, 1958, letter that the pleats of this first article had been backstitched. The backstitching was incomplete on only two of the several pleats in the curtain. Apparently, no pleat was entirely without backstitching. In addition, it can be inferred from the lack of discrepancies noted on First Article for No. 11, returned to plaintiff at the same time, that it was also backstitched. Defendant's Inspector Paul testified that the initial first article was backstitched. It is clear that the letter of November 11, 1958, did not require a contract change. If any such change was made, it was instituted prior to November 11, 1958.

On the subject of prior directions concerning backstitching, Shayman's testimony was very vague. He did not testify that he had been specifically directed to

backstitch or that there had been any dispute over backstitching. He was content to say only that he must have been directed to backstitch, since it was not a contract requirement.

No evidence was presented to show what, if any, additional time was required because of the backstitching requirement. Nor was this supposed additional requirement ever mentioned in any of the correspondence between the parties, or in an appeal to the Secretary of the Air Force as one of the grounds for reversing the terminations.

G. *Bar Marks:* Plaintiff's contention in its brief before the ASBCA and in its petition to this court is that some of the fabric for Items 31–35 was erroneously rejected for having too many bar marks when bar marks were inherent in the fabric specified for those items. Plaintiff's initial position on appeal to the Secretary was that defendant had been arbitrary and capricious because it rejected fabric for Items 31–35 for bar marks while it accepted "bar marked fabric" which it had supplied to plaintiff for Item No. 3. Since the defendant's inspector had also rejected the defendant-supplied fabric the argument that the defendant had been inconsistent was necessarily abandoned.

Bar marks are variations in the shading of the fabric. The ASBCA held that the evidence established that a bar mark is a defect and that any delay would be attributable to the supplier. It held further that, since plaintiff did not show that the supplier default was excusable, its default is not excusable.

Clause 11(c) of the Standard (Supply Contract) Form #32, provides:

* * * If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

Taken in conjunction with the above-quoted paragraph, the term "subcontractor" in paragraph (e) of Clause 11,[17] contemplates that suppliers are included in the term "subcontractors," as well as those normally considered subcontractors, i. e., persons or companies working under the direct supervision of the contractor.

Therefore, if the contractor defaults because of a supplier default, it is required to show that the supplier was not negligent in order to come within the termination for convenience provision. Plaintiff made no attempt to show that its supplier was not negligent. Although this requirement can put a well-nigh impossible burden on a contractor, the burden was not met in this case.

The record is in some confusion as to whether bar marks were inherent in Neptune cloth. "Barré marks" was listed as a fabric defect in the Federal Glossary of Fabric Imperfections and was listed as a defect on the Classification of Defects and Final Inspection Check List, to which Mr. Shayman either made no objection or acquiesced.

Mr. Shayman testified that the bar marks resulted because color for glass fabrics was printed by rollers, rather than dyed. If this is correct, the bar marks were undoubtedly an imperfection, since bar marks did not appear on any of the several glass fabrics other than the Neptune cloth and the Government-furnished fabric for Item No. 3. There is nothing in the testimony to show that Neptune cloth differed from other glass fabrics in its reception of the color printing process. It would therefore appear that the ASBCA view is supported by substantial evidence.

■ The record includes substantial evidence to support the ASBCA finding that the defaults were, in large part, the result of plaintiff's negligence and fail-

17. See supra.

ure to order the necessary fabric and plan production in a timely manner.

Except for the item of "bottom hems", it is found that plaintiff is not entitled to the benefits of the termination for convenience clause of the contract. With respect to that item, further proceedings will have to await findings by the ASBCA.

CONCLUSION OF LAW

Upon the foregoing opinion which is made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover as to all items except "bottom hems". The petition is therefore dismissed as to such items. With respect to "bottom hems", proceedings are suspended to allow the parties to return to the ASBCA for the necessary factual determinations.